**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00579 (DLF)** |
| **v.** | : | |
| | : | |
| **BRANDON STRAKA,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brandon Straka to four months of home detention, a probationary term of three years, no less than 60 hours of community service, and $500 in restitution.

**I.     Introduction**

The defendant, Brandon Straka, is a social media influencer who live-streamed his participation in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

Straka pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Grounds. As explained herein, a four-month home detention sentence is appropriate in this case because: (1) the defendant has a significant public profile, which he utilized to promote his activity on January 6, (2) the defendant learned of the breach of the U.S. Capitol Building and went to join the rioters; (3) upon arriving at the U.S. Capitol, the defendant encouraged others to

storm the U.S. Capitol; (4) the defendant recorded video of the rioters entering the U.S. Capitol; (5) the defendant encouraged rioters to take an officer's protective shield from the officer's possession, and (6) the defendant took to social media and encouraged rioters who remained at the U.S. Capitol to "hold the line" even after he had left Capitol grounds on January 6.

Even if he didn't personally engage in violence or property destruction during the riot, Straka encouraged and celebrated the violence of that day. In the lead up to January 6, Straka posted a series of messages to his significant number of social media followers indicating that a presidential transition cannot be allowed, that a civil war had begun, and that "we're not going to be peaceful much longer." On January 6, Straka posted video footage that he filmed on January 6 to his Twitter page. In the video, Straka can be heard inciting the crowd by yelling "go, go, go" as the crowd approached the U.S. Capitol and made entry into the U.S. Capitol.

Straka also captured video footage of rioters aggressively taking a riot shield away from a U.S. Capitol Police Officer who was standing near a doorway of the U.S. Capitol. Straka and others can be heard stating "take it, take it." The rioters successfully seized the officer's shield and celebrated doing so by chanting "USA." After his departure, but while law enforcement was still trying to clear the area, Straka tweeted out, "Patriots at the Capitol- HOLD. THE. LINE!!!!" Due to his considerable media influence, this message was liked and retweeted by thousands of other Twitter users.

During a presentence interview with U.S. Probation, the defendant expressed remorse for his actions. During his interview, the defendant stated that "if he could go back in time, he would never have gone to Washington D.C." Straka described his conduct on January 6 as "one of the stupidest and tragic decisions of his life." Straka lamented about how this incident has impacted his life and his business. He also informed U.S. Probation that he "feels the consequences for his

actions have been quite extreme and disproportionate given his involvement in the offense is a misdemeanor."

The Court must consider that Straka's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

Here, Straka's participation in a riot that actually succeeded in halting the Congressional certification combined with his celebration and endorsement of the unauthorized entry of the U.S. Capitol and violent conduct of the rioters to his hundreds of thousands of followers, his act of encouraging rioters to take a U.S. Capitol Police officer's shield, and the need for deterrence renders a four-month home detention sentence both necessary and appropriate in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 26 (Statement of Offense), at 1-10. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Brandon Straka's Role in the January 6, 2021 Attack on the Capitol*

Straka is a former hair stylist who posted a testimonial video to YouTube on June 29, 2018 that went viral, garnering more than 41,000 likes and more than 890,000 views.  Brandon Straka, *Why I left the Democrat Party*, https://www.youtube.com/watch?v=51UGcghHZsk (last viewed Dec. 16, 2021). Straka used this exposure to become a social media influencer and political leader, as the founder and president of the "#WalkAway Campaign."  *See* ECF 28 at ¶ 57.  This organization is comprised of the #WalkAway Foundation, a 501(c)(3) not-for-profit organization,[1] and the #WalkAway Campaign PAC, a political action committee.[2]  As chairman of the foundation, Straka has reported that he works 60 hours per week to facilitate the organization's mission to "provide fact-based education through media, live events, speaking engagements, and college campus tours."  Internal Revenue Service (2020) *Form 990: Return of Organization Exempt from Income Tax: WalkAway Foundation* at 2, 7. (available as "IRS Annual Return" at https://www.charitiesnys.com/RegistrySearch/show_details.jsp?id={E0F85A6A-0000-CE1E-92F3-A503D3E0CF0A}).  In December 2020, the #WalkAway Foundation reported $648,464 in revenue for the prior year. *Id.*  #WalkAway PAC reported gross receipts of $29,101 for the same period.  Federal Elections Commission (2020) *Report of Receipts and Disbursements for Other Than An Authorized Committee: #Walkaway Campaign PAC* at 2 (available at https://docquery.fec.gov/pdf/613/202101299414039613/202101299414039613.pdf#navpanes=0) In addition to his fundraising success, Straka has cultivated a substantial social media following,

---

[1] *See* #WalkAway Foundation website, located at https://www.walkawayfoundation.org/ (describing the organization as "our non-profit 501c3 organization, evolved organically from an avalanche of grassroots support for a single YouTube post.") (last visited on December 16, 2021).

[2] *See* #WalkAway Campaign PAC website, located at https://www.walkawaypac.org/ (last visited on December 16, 2021).

with more than 211,000 current subscribers to his #WalkAway Campaign YouTube channel[3] and, as of January 6, 2021, more than 660,000 Twitter followers.[4]  It was in his role as a high-profile president of a political organization and charitable foundation that led Straka to travel the country in the lead up to and in the wake of the 2020 election.

Following the election, Straka stoked the passions of his followers, frequently telling the "Patriots" that it was time to "rise up" as part of a "civil war."  Many of these messages contain rhetorical flourishes that are common in political speech.  However, some of Straka's references to concrete planning and action could reasonably have been interpreted by some readers as a call for more than just a figurative struggle.  In early December 2020, Straka sent out messages informing them that they "could not allow" a presidential transition and encouraging his followers to prepare for a civil war.  Gov. Figure A.  Gov. Figure B.

---

[3] #WalkAway Campaign YouTube Channel,
https://www.youtube.com/c/WalkAwayCampaign/videos?view=0&sort=p&flow=grid (last visited December 16, 2021)
[4] Twitter page for @BrandonStraka, archived on January 6, 2021 (available at
https://web.archive.org/web/20210106082331/https://twitter.com/BrandonStraka)



We can not allow a transition to Biden under these circumstances. This is not ok. 74M+ Americans know that something is horribly wrong and feel victimized by the politicians and the media orchestrating this scam.

If we don't get a thorough audit we must not allow a transfer.

9:19 PM · 12/1/20 · Twitter for iPhone

Gov. Figure A



Part of what paralyzes ppl when it's crucial to act & essential to fight is uncertainty & unpreparedness.

Make peace right now w the fact that we are in a civil war. We didn't want it & didn't start it. But it's here. They're counting on your silence & compliance to win.
Don't.

9:48 AM · 12/2/20 · Twitter for iPhone

Gov. Figure B

Then, on December 19, 2020, Straka shared a video of and quoted an individual who stated that it was his intention not to be "peaceful for much longer."  Gov. Figure C; original video available at

https://twitter.com/speakupmoveout/status/1340274672768827394   (last viewed January 13, 2021).  Straka's post, which was viewed more than 100,000 times, included a message that it was time to "rise up!" *Id*.



Gov. Figure C

It was in this context that Straka traveled to Washington D.C. on January 4, 2021, from where he had been working on the special election in Atlanta, Georgia to attend several "Stop the Steal" events where he would be a featured speaker. *See* ECF 28 at ¶ 17.  One of the more prominent of these was a large rally on January 5, 2021 at Freedom Plaza in Northwest, DC.  *LIVE NOW: Crowds have gathered for the "Stop the Steal rally in Washington, DC.* WPTV NewsChannel 5 (available at https://www.facebook.com/WPTV5/videos/live-stop-the-steal-rally-in-washington-dc/209369994185413/).   During his five-minute long speech, Straka again used common rhetorical flourishes, referring to the rally attendees as "patriots," and referenced a "revolution" multiple times. *Id. at 32:27-37:18*   Straka directed the attendees to "fight back." *Id.*

The next day, January 6, 2021, Straka attended the "Rally to Save America" on the White House Ellipse and then planned to travel to an area near the U.S. Capitol Building where he was going to give another speech. *See* ECF 1, p. 2 at ¶ 3  Straka used the Metro to travel to the U.S. Capitol. *Id*. While traveling to the U.S. Capitol, he received alerts on his telephone stating that former Vice President Mike Pence was "not going to object to certifying Joe Biden." *Id*. Straka continued to make his way to the U.S. Capitol. *Id*. While walking, Straka learned that the U.S. Capitol had been breached. *Id*. Straka estimated that he got off of the Metro sometime between 2:00 p.m. and 2:20 p.m. before making his way to the U.S. Capitol grounds. *See* ECF 28, at ¶ 18.

 Upon arriving at the U.S. Capitol from the east side, Straka observed a crowd of people outside of the U.S. Capitol.  Undeterred, Straka made his way through the crowd, into the restricted area of the U.S. Capitol grounds, and up the East Front steps of the U.S. Capitol.  While in the restricted area, Straka observed the crowd yelling and U.S. Capitol Police trying to prevent people from going into the U.S. Capitol.

Straka recorded himself while in this restricted area.[5]  As Straka stood outside of the U.S. Capitol, he observed people attempting to make entry into the U.S. Capitol.  Straka can be heard stating, "We're going in.  They're saying we're going in.  People are going in." *See* Exhibit 1.  As the crowd moves forward, Straka can be heard stating, "go, go, go." *See* ECF 26, at ¶ 9.   Straka was standing a mere 10 to 20 feet away East Rotunda Doors while encouraging the rioters to enter the U.S. Capitol. *See* ECF 1, p. 2 at ¶ 5.

Straka continued to film the mayhem and the chaos outside of the U.S. Capitol.  He denied seeing any vandalism or acts of violence. *See* ECF 28, at ¶ 25.  Nevertheless, the chanting crowd

---

[5] A member of the public recorded Straka's January 6 video posting and, after it was taken down, independently published it on YouTube.  *Brandon Straka attacking the Capitol on January 6th* (available at https://www.youtube.com/watch?app=desktop&v=kEAIsOfUoEs&feature=emb_title).  The government has provided the Court with this video via USA*fx*.  The video is named "Exhibit 1: Straka- January 6 video."

continued to make entry into the U.S. Capitol while making statements such as "This is our house" and "This is our country, and we are taking it back." *See* Exhibit 1.

Straka continued to film while rioters forcefully removed a police officer's shield from his possession. *See* ECF 28, at ¶ 18. *See also* Exhibit 1. The crowd can be heard chanting "take it, take it." *Id*. Straka chants along with the crowd as the rioters successfully pulled the shield away from the officer as he struggled to maintain possession of his shield. *See* ECF 1, pp. 4-7. A large group of people then simultaneously pushed toward the officer as Straka and others chanted, "USA!" *Id*. The officer was able to get his shield back. *Id*. There is no indication that Straka participated in removing the shield from the officer.  Yet, Straka does nothing to discourage the rioters from removing the shield.  Instead, Straka encouraged the rioters to take the shield away from the officer.

Straka made his way within feet of the threshold of the East Rotunda Doors of the U.S. Capitol.  Numerous rioters entered the U.S. Capitol.  Many more attempted to enter.  While standing near the entrance, Straka was exposed to tear gas that was released inside of the U.S. Capitol by U.S. Capitol Police Officers. *See* ECF 1, p. 5 at ¶ 2.  Despite this, at no point did Straka discourage the rioters from making entry.  Straka continued to film himself, this time turning the camera towards his face and stating: "They are using gas right now.  We are being gassed." *Id*. Straka wore a black colored beanie, sunglasses, a face mask, and a plaid-patterned coat.  Gov. Figure D.



Gov. Figure D

Thereafter, a male exiting the U.S. Capitol could be heard saying, "We did our job…We got our job done." This individual then said, "Let's get out of here." Another individual stated, "Mission accomplished." *See* Exhibit 1. *See also See* ECF 1, p.6 at ¶ 1. The video ended with Straka standing outside of the U.S. Capitol. *Id*. Straka estimates that he stood outside of the U.S. Capitol for approximately fifteen minutes, and then left without having entered the building.  *See* ECF 28, at ¶ 18.  As stated in the executed Statement of Facts, Straka knew that he did not have permission to enter the Grounds when he did so on January 6. *See* ECF26.  Straka knew that Congress was in session on January 6, 2021. *Id.* Straka intended to disrupt that session of Congress. *Id.*

At 2:33 pm on January 6, 2021, Michael Coudrey, the national coordinator for Stop the Steal, sent a message to a group chat telling those in the chat that the event that Straka was scheduled to speak at would be delayed because "They stormed the capital[sic]."  Joshua Kaplan and Joaquin Sapien, *New Details Suggest Sernior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, ProPublica (June 25, 2021) available at https://www.propublica.org/article/new-details-

suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic (last visited December 16, 2021).

Straka responded, "I just got gassed! Never felt so fucking alive in my life!!!" *Id*.  Later, as law

enforcement was still working to clear rioters from Capitol grounds, Straka encouraged them to

continue fighting:



**Brandon Straka** ✔
@BrandonStraka

## Patriots at the Capitol-
## HOLD. THE. LINE!!!!

5:33 PM · Jan 6, 2021 · Twitter for iPhone

**2.9K** Retweets   **65** Quote Tweets   **15.8K** Likes

Gov. Figure E

Straka posted the video of himself on the grounds of the U.S. Capitol on January 6 on his personal

Twitter page.  On January 11, the FBI learned of this posting after receiving a tip about the video

being posted on Twitter. *See* ECF 1, p. 2 at ¶ 1. When the FBI attempted to view the video on the

evening of January 11, the video had been removed. *Id*.

Straka also posted a thread on January 6 summing up his thoughts on the day:

• "I arrived at the Capitol a few hours ago as Patriots were storming from all sides. I was
quite close to entering myself as police began tear gassing us from the door. I inhaled tear
gas & got it in my eyes. Patriots began exiting shortly after saying Congress had been
cleared."

• "I'm completely confused. For 6-8 weeks everybody on the right has been saying '1776!'
& that if congress moves forward it will mean a revolution! So congress moves forward.
Patriots storm the Capitol – now everybody is virtual signaling their embarrassment that
this happened."

• "Also- be embarrassed & hide if you need to- but I was there. It was not Antifa at the
Capitol. It was freedom loving Patriots who were DESPERATE to fight for the final hope

of our Republic because literally nobody cares about them. Everyone else can denounce them. I will not."

• "Perhaps I missed the part where it was agreed this would be a revolution of ice cream cones & hair-braiding parties to take our government back from lying, cheating globally interested swamp parasites. My bad." Gov. Figure F



Gov. Figure F

*Social Media Posts*

On January 6, Straka posted comments to his Twitter account while he was at the U.S. Capitol.  Straka promoted the riot and did not speak against the conduct of the rioters or his own conduct.  Straka also posted the video that he recorded while at the U.S. Capitol to Twitter.

The following day, Straka posted a 58-minute video to his Twitter account.[6] *See* Exhibit 2. In this video, Straka recounted the events of January 6. Straka used this posting to clarify comments that he made on Twitter on January 6 after he left the U.S. Capitol.  Straka stated, "It was not Antifa, it was patriots desperate to be heard. When I made that comment on Twitter, I had no idea that there was any vandalism or violence or any of that stuff. I literally saw people walking through an open door, and for anyone who doubts my story, I have it all on video. I have the entire thing on video."  While Straka had an immense platform to  denounce his own conduct and the conduct of the rioters, he elected not to do so and instead doubled down on his inflammatory rhetoric.

*Straka's Interview*

Straka was arrested on January 25, 2021. Straka voluntarily agreed to be interviewed by FBI. Straka's initial interview occurred on February 17, 2021.  Straka recounted what occurred on January 6.  Straka denied seeing any police officers as he walked to the U.S. Capitol.  He also denied seeing any barriers or signage indicating that the U.S. Capitol was closed. Straka denied removing the posts out of fear of getting arrested.  Instead, he explained that he removed the videos because he felt "ashamed."  He denied knowing that people were "attacking, hurting, and killing people."

---

[6] The government has provided the Court with this video via USA*fx*.  The video is named "Exhibit 2: Straka-January 7 video."

Straka described seeing people "clustered" and "packed in" near the entrance to the U.S. Capitol.  He admitted to video recording the event and later posting and removing the videos from Twitter.  He also admitted knowing that the rioters were entering the U.S. Capitol without authorization and with the intent to interfere with Congress. Straka provided additional information to the FBI regarding the events leading up to and during January 6.

After this initial interview, the FBI met with Straka a second time on March 25, 2021 with follow-up questions.  Straka was cooperative during the interviews.

On January 5, 2022, Straka met with prosecutors from the United States Attorney's Office and the FBI a third time.  The purpose of the interview was for the government to ask Straka follow-up questions.  Consistent with his previous interviews, Straka was cooperative.  The interviews were conducted in anticipation of the plea agreement that defendant would later enter.[7]

*The Charges and Plea Agreement*

On January 20, 2021, Straka was charged by complaint with violating 18 U.S.C. § 231(a)(3), impeding a law enforcement officer during civil disorder; 18 U.S.C. §§ 1752(a)(1) and (2), knowingly entering and remaining on restricted grounds without lawful authority and/or engaging in disorderly conduct within proximity to a restricted building to impede official functions; and 40 U.S.C. §§ 5104(e)(2)(D), engaging in disorderly conduct with the intent to disturb a hearing before Congress.

On September 15, 2021, Straka was charged in one-count Information with violating 40 U.S.C. §§ 5104(e)(2)(D).  On October 5, 2021, the government filed a Superseding Information charging Straka with 40 U.S.C. §§ 5104(e)(2)(D). By plea agreement, Straka agreed to pay $500 in restitution to the Department of the Treasury.

---

[7] The government will supplement this filing with a sealed addendum that will provide this Court with information related to Brandon Straka's interviews.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(D). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).

In this case, as described below, some of the Section 3553(a) factors weigh in favor of incarceration and some support a more lenient sentence. Conceding the fact that Straka did not enter the U.S. Capitol, the government believes that the following factors weigh in favor of incarceration: (1) the defendant has a significant public profile, which he utilized to promote his activity on January 6, (2) the defendant learned of the breach of the U.S. Capitol Building and went to join the rioters; (3) upon arriving at the U.S. Capitol, the defendant encouraged others to storm the U.S. Capitol; (4) the defendant recorded video of the rioters entering the U.S. Capitol; (5) the defendant encouraged rioters to take an officer's protective shield from the officer's

possession, and (6) the defendant took to social media and encouraged rioters who remained at the U.S. Capitol to "hold the line" even after he had left Capitol grounds on January 6. Nevertheless, in addition to the fact that he did not enter the Capitol Building and did not initially witness violence as he approached from the east front, the government has given considerable weight to Straka's early willingness to agree to be interviewed by law enforcement and acknowledge his wrongdoing. Straka's participation in three interviews made at the government's request as well as what appear to be sincere expressions of remorse serve as a strong counter to his aggravating conduct, namely, his abuse of his responsibility as a public figure not to agitate and inflame the passions of a riotous mob. The government therefore believes a long sentence of home detention is sufficient to punish the defendant.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered Capitol grounds on January 6 without authorization did so under the most extreme of circumstances. As they approached the Capitol Building, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

16

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants.

Here, Straka deliberately decided to go towards the chaos, destruction, and violence that occurred at the U.S. Capitol.  Prior to arriving, Straka heard that the U.S. Capitol had been breached.  He also learned that the event that he had been scheduled to speak at had been cancelled. Instead of not going to the U.S. Capitol, Straka went to join the crowd.  Because he arrived by Metrorail, Straka approached the building from the east side, avoiding the largest crowds and not seeing some of the most significant violence that day.  However, upon arriving, Straka encouraged rioters to enter the U.S. Capitol while perceiving through the sights, sounds, and smells

surrounding him that this was not permitted.  He also encouraged rioters to remove the officer's shield while the officer was attempting to prevent rioters from entering the U.S. Capitol.  Straka recorded the chaos and heard the rioters as they chanted remarks such as "this is our house," and "this is our country." At no time did Straka turn away.  Instead, Straka aligned himself with the rioters by making comments such as "We're going in.  They're saying we're going in."  Straka participated in the chants and yelling that occurred outside of the U.S. Capitol.

After the U.S. Capitol breach, Straka proudly posted the video footage that he recorded. Straka later removed the videos after posting them.

These facts are important as they show that Straka knowingly and willfully decided to participate in the breach of the U.S. Capitol.  Straka's decision to converge on the Capitol after learning that it has been "breached," coupled with his Twitter posts clearly reveals Straka's intent. Straka clearly sponsored the video by posting the January 6 and January 7, 2021 videos on Twitter, as well as making written posts on January 6. While Straka did not enter the U.S. Capitol, he stood by while others did so.  He chanted with the rioters, encouraged them to enter the U.S. Capitol, and celebrated the unauthorized entries into the U.S. Capitol.  Exhibit 1 encapsulates Straka's posture on that day.

Straka stood at the entrance of the East Rotunda Doors as rioters attempted to enter despite the presence of officers near the door. Alarms from inside the U.S. Capitol can be heard in the background as Straka approaches the doorway's entrance: a loud, high-pitched, continuous beeping, similar to a smoke alarm.  If Straka was unaware that his and the rioters' presence was not authorized, he should have known it when he heard the sound of the alarms.  Additionally, as Straka approached the doorway, he was met by the smell of tear gas that had been deployed by

officers inside of the U.S. Capitol.  This, again, should have signaled to Straka that his presence on the U.S. Capitol grounds was unauthorized.

Straka's January 6 statements on social media demonstrate an endorsement of what he saw. Straka told the "patriots at the Capitol" to "hold the line."  Straka then boasted about being at the U.S. Capitol explaining that he was close to entering before being tear gassed.  The video footage and Straka's statement suggests that, but for coming into contact with tear gas, Straka may have entered the U.S. Capitol.  Straka expressly justified the activities of the "patriots" by stating that he refused to denounce their activities.  Straka's statements in the immediate aftermath of January 6 show a total lack of remorse. After leaving the U.S. Capitol, Straka proudly posted about his conduct and that of his "patriots."  In his 58-minute video, Exhibit 2, Straka justified his conduct and that of the rioters, while also acknowledging that he did not observe violence or destruction. It was not until his initial interview with FBI later that month that Straka expressed remorse for his behavior.  During his interview, Straka told agents that he removed his Twitter videos because he felt ashamed of his conduct.  This statement, however, was made post-arrest.  There is no indication that Straka used his social media to disavow what occurred on January 6 prior to meeting with agents.

**B.  The History and Characteristics of the Defendant**

As set forth in the PSR, Straka does not have a criminal history. *See* ECF 28 ¶¶ 29-31. Straka is self-employed and the founder and president of the #Walkaway Campaign, a successful political nonprofit.  As a high-profile public figure with a large social media following, Straka's actions on January 6 inflamed a dangerous situation.  Straka encouraged rioters to enter the U.S. Capitol, both in person and on social media, and continued to encourage them to "hold the line" even after he had personally left the area.

In the aftermath of the riot, Straka continued to display pride in having attended the U.S. Capitol breach as evidenced by his social media communications.  Straka has indicated that his decision to attend the U.S. Capitol breach was "stupid and a tragic decision."  In his interview with FBI, Straka stated that he did not know that violence and death would occur that day.  He then expressed shame for participating in the event.  Yet, it is worth pointing out that Straka believes that "the consequences for his actions this far have been quite extreme and disproportionate given his involvement."  Straka also believes that he is misunderstood.  He has also expressed concern about how his business has been affected.  ECF 28 ¶¶ 23-25.  These statements indicate that Straka does not understand the gravamen of his conduct and that of the rioters on January 6.

Accordingly, the nature and the circumstances of this offense establish the clear need for a long sentence of home detention in this matter.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

As a public figure who continues to have a large social media following, Straka has a responsibility to ensure that his rhetorical flourishes do not endanger others. Straka cheered the crowd that breached the U.S Capitol; he celebrated the breach by posting video to Twitter; he encouraged rioters to take a police officer's shield by chanting "Take the shield" and "USA" after the shield was taken. Although Straka did not enter the Capitol Building after coming into contact with tear gas, he stood by while alarms blared and continued to film individuals entering the U.S. Capitol and encouraged rioters to enter. Even after experiencing these things and deciding to personally leave Capitol grounds, he took to social media to encourage those rioters who remained to continue to "hold the line." In the context of his public prominence, these are aggravating factors.

As of the date of this filing, Straka has expressed remorse. The government acknowledges that Straka accepted responsibility early by entering into this plea agreement and was cooperative

with law enforcement. Therefore, a long home detention sentence appears to be necessary to deter the defendant.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[9] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[10] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*,

---

[9] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[10] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant has pleaded guilty to Count One of the Superseding Information, charging him with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(D). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding

unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch

of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentence imposed in cases with similarities in this case.  Here, the government argues that the following aggravating factors should be considered for sentencing: (1) the defendant has a significant public profile, which he utilized to promote his activity on January 6, (2) the defendant learned of the breach of the U.S. Capitol and went to join the rioters; (3) upon arriving at the U.S. Capitol, the defendant encouraged others to storm the U.S. Capitol; (4) the defendant recorded video of the rioters entering the U.S. Capitol; (5) the defendant encouraged rioters to take an officer's protective shield from the officer's possession, and (6) the defendant took to social media and encouraged rioters who remained at the U.S. Capitol to "hold the line" even after he had left Capitol grounds on January 6.

 The government acknowledges that Straka has since stated that he is "ashamed" of his behavior and that his decision that day was "one of the stupidest and tragic decisions of his life."

This remorse is a mitigating factor in favor of the defendant.  Other mitigating factors that may be considered are: (1) the defendant did not enter the U.S. Capitol Building; (2) the defendant

voluntarily met with FBI after his arrest and provided information about his conduct and other aspects of January 6; and (3) defendant's early acceptance of responsibility.

While many of the defendants sentenced to home detention share a common fact in that they entered the U.S. Capitol, these cases are comparable to his case.  In *United States v. Jessica Bustle*, 21-cr-238-TFH, the Court sentenced the defendant to 2 months home detention.  Bustle entered the U.S. Capitol for approximately 20 minutes.  She did not conduct any assaultive or destructive behavior inside of the U.S. Capitol.  Like Straka, Bustle also approached the Capitol from the east front and did not initially witness the violence and struggle that was more readily apparent to individuals who came near the large struggles near the inaugural stage.  Bustle also attempted to minimize and at times justify the rioters' conduct on January 6.  She also posted a number of social media posts such as writing "we stormed the Capitol" and referring to former Vice President Pence as a "traitor."  Bustle also posted, "We didn't win this thing sitting on the sidelines.  Excited to stand for truth with my fellow patriots and freedom fights in DC today."

In another case, *United States v. Andrew Bennett*, 21-cr-227-JEB, the Court imposed a sentence of 3 months home detention. Prior to January 6, Bennett posted, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!"  Before the breach occurred, Bennett livestreamed the crowd outside of the U.S. Capitol while the crowd yelled at an officer shooting less-than-lethal munition at the growing crowd.  Bennett did enter the U.S. Capitol and remained inside approximately 25 minutes.  Bennett boasted on social media about his unlawful entry.  Bennett also had a criminal history which included five criminal convictions.  The Court considered the aggravating factors to be Bennett's January 4, 2021 posts and noted that the posts showed that Bennett had an intent to do more than watch the rally.  Bennett also claimed an affiliation to the Proud Boys.  The Court also considered mitigating factors as well: Bennett

admonished others to not assault officers or destroy property; Bennett cooperated fully and early; Bennett complied with pretrial services; Bennett did not destroy evidence; Bennett had a history of steady employment.

Here, the Court should also consider the sentences in *Bustle* and *Bennett* to be imposed on Straka. Straka was away from the U.S. Capitol when he heard about the breach. Instead of remaining outside of the U.S. Capitol grounds, Straka went to the riot. Straka's appearance only made responding officers' responsibilities more difficult. While law enforcement inside and outside of the U.S. Capitol attempted to diffuse the riot, individuals such as Straka incited the rioters to remain at the U.S. Capitol. Straka went further by encouraging the rioters to enter the U.S. Capitol. Straka can be heard on video yelling and telling the rioters to "go, go, go" as they attempted to enter the U.S. Capitol. Additionally, Straka sanctioned the seizure of a police officer's shield while the officer attempted to keep out the crowd of rioters growing closer to the U.S. Capitol. Straka can be heard saying "take it, take it." Straka's actions escalated the conduct of the rioters.

Straka's primary occupation is as an influencer. Having embraced that vocation, he must be cognizant of his power to influence others. Undoubtedly, Straka's hundreds of thousands of social media followers were tuned into his presence at the U.S. Capitol on January 6 and saw him encouraging them to join in and continue the unrest. Straka did nothing to display to these followers that his conduct was shameful. He even boasted about his conduct by posting about the riot the following day.

Straka's conduct on January 6 was egregious based on the conduct captured in Exhibit 1. Considering the aggravating and mitigating factors, the government's request for a sentence of four-months home detention satisfies the sentencing factors in § 3553(a).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Brandon Straka to four months home detention, a probationary term of three years, no less than 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes

respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:     /s/ Brittany L. Reed
BRITTANY L. REED
Assistant United States Attorney
Detailee- La. Bar Roll No. 31299
U.S. Attorney's Office
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Office: 504-680-3031
Brittany.Reed2@usdoj.gov