IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:21-CR-00579 (DLF) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| BRANDON STRAKA, | ) | |
| | ) | |
| Defendant. | ) | |

**RESPONSE TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Brandon J. Straka, through undersigned counsel, respectfully submits his response to the government's sentencing memorandum filed on January 13, 2022.[1]

**I.     Introduction**

Before the Court is the sentencing of defendant for a single misdemeanor violation of 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in the Capitol Grounds. On this Class B misdemeanor, the government filed a 30-page sentencing position filled with hyperbolic rhetoric, out of context statements of defendant, and non-relevant conduct designed to stoke political flames. The government fixates on defendant's social media following and is apparently attempting to make a public example of a prominent Trump-supporting influencer. In its brief, the government attacks defendant's constitutionally protected political speech, beliefs, and activities. This is both

---

[1] Defendant feels compelled to respond on the record to the government's sentencing memorandum, which was filed one week prior to the sentencing hearing. The government had the benefit of reading and considering defendant's sentencing position, which was timely filed on December 10, 2021, when drafting its position. The government missed this deadline and informed defendant the following day that it was seeking to continue the sentencing hearing. The government sought a stipulation to continue, which defendant agreed to join, based on the government's representation that it would consider a request from defendant to dismiss this case. The government informed defendant on January 13, 2022, that his request was denied and proceeded to file its sentencing position containing highly inflammatory characterizations of defendant.

1

unconstitutional and in clear violation of the Department of Justice's own guidelines. Section 9-27.730 of the Department of Justice Manual provides:

> The attorney for the government should make sentencing recommendations based on an individualized assessment of the facts and circumstances of each case and the history and characteristics of the defendant, without improper consideration of the defendant's race, religion, gender, ethnicity, national origin, sexual orientation, or *political association, activities, or beliefs*.

Defendant accepts full responsibility for his conduct at the Capitol on January 6 and has expressed remorse for entering the restricted Capitol Grounds. In evaluating an appropriate sentence for this offense, the following factors weigh heavily for a modest non-custodial sentence: (1) defendant did not enter the Capitol, (2) defendant did not engage in any violence, (3) defendant did not possess any weapons, (4) defendant accepted early responsibility for his conduct and voluntarily submitted to three separate government interviews.

During the interviews the government was focused on establishing an organized conspiracy between defendant, President Donald J. Trump, and allies of the former president, to disrupt the Joint Session of Congress on January 6. Defendant answered all questions truthfully and denied the existence of any such plot. In August 2021, the FBI arrived at the same conclusion and found no evidence that violence was centrally coordinated by any individual or group.[2] Despite these findings, the government persists with a false narrative that defendant's actions were premeditated and orchestrated in concert with the greater mob that stormed the Capitol. The Court should reject this improper attempt to expand the scope of the appropriate sentencing factors, and consider only defendant's relevant conduct with respect to the charged offense: misdemeanor disorderly conduct.

---

[2] *See* Mark Hosenball, *Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated – sources*, Reuters, August 20, 2021, https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/

**II.     The Government's Inappropriate and Distorted References to Defendant's Constitutionally Protected Speech Should Not Be Considered**

Speech critical of government officials and public conduct lies at the very heart of the First Amendment. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034 (1991). Because of this, statements of unpopular advocacy, ostracized ideas, and painfully ugly and regressive comments are fully protected as free speech. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (the First Amendment's purpose is to protect unpopular speakers from retaliation and their ideas from suppression).

***Defendant Was Protesting Legitimate Concerns with the 2020 Presidential Election***

"The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances." *Smith v. Ark. State Highway Emp., Loc.1315*, 441 U.S. 463, 464 (1979). The government is prohibited from infringing upon these rights by either "a general prohibition against certain forms of advocacy . . . or . . . imposing sanctions for the expression of particular views it opposes. . . ." *Id*. (citing *NAACP v. Button*, 371 U.S. 415 (1963); *Brandenburg v. Ohio*, 395 U.S. 444 (1969); and *Garrison v. La.*, 379 U.S. 64 (1964)).

Defendant and others present on January 6 were engaged in a protest to express their dissatisfaction with the manner in which the 2020 presidential election was conducted and certified. Doing so in a peaceful manner was well within their First Amendment rights. The government repeatedly instructs this Court to consider this case in the larger context but says nothing about why the protestors were actually present on January 6 or the legitimate concerns they wanted addressed by their elected representatives.

An example of one of the many complaints with the 2020 presidential election is the decision of the Pennsylvania Supreme Court to unilaterally extend the deadline for receiving mail-in ballots by three days. Justice Thomas summed up the Constitutional concern succinctly:

> The Constitution gives to each state legislature authority to determine the "Manner" of federal elections. Art. I, §4, cl. 1; Art. II, §1, cl. 2. Yet both before and after the 2020 election, nonlegislative officials in various States took it upon themselves to set the rules instead. As a result, we received an unusually high number of petitions and emergency applications contesting those changes. The petitions here present a clear example. The Pennsylvania Legislature established an unambiguous deadline for receiving mail-in ballots: 8 p.m. on election day. Dissatisfied, the Pennsylvania Supreme Court extended that deadline by three days. The court also ordered officials to count ballots received by the new deadline even if there was no evidence—such as a postmark— that the ballots were mailed by election day.

*Republican Party v. Degraffenreid*, 141 S. Ct. 732, 732-33 (2021) (Thomas, C., dissenting).

Echoing the concerns of defendant and the vast majority of peaceful protestors present on January 6, a total of 8 Senators and 139 House Members objected to the certification of election results from several states.[3] Raising concerns and objecting to the electoral college vote is not a nefarious attack on our democracy — it is a core component of ensuring the legitimacy of our constitutional republic. Since 1887, 3 U.S.C. § 15 has set the procedure for Members of Congress to object to electoral votes. Lawmakers may object to individual electoral votes or to state returns as a whole during the Joint Session. Defendant was present on January 6 to call on elected officials to lawfully object to the electoral college vote, consistent with the procedures outlined in 3 U.S.C. § 15.

### *Defendant's Pre-January 6 Comments Are Protected Political Speech*

The government attempts to hold defendant responsible for the violent attack on the Capitol by suggesting that his public comments prior to January 6 played a key role in inciting a violent

---

[3] *See* Harry Stevens, *How members of Congress voted on counting the electoral college vote*, The Washington Post, January 7, 2021, https://www.washingtonpost.com/graphics/2021/politics/congress-electoral-college-count-tracker/.

4

mob to breach the Capitol. Nothing could be further from the truth. In support of its narrative, the government seizes on three tweets defendant made prior to January 6. *See* ECF 36, Figures A, B, and C. The government describes most of defendant's statements out of context and applies the most perverse interpretation to them. In reality, defendant's statements were discussions of abstract advocacy about a highly contested presidential election.

The first and second tweet sent in early December 2020 were a pair of strongly worded messages opposing the transition to President Biden without an audit of contested election results. Gov. Figure A and B. Defendant states, "If we don't get a thorough audit we must not allow a transfer." The references in the tweet to a "civil war" was not a call to violence, as the government suggests, it was a figure of speech referencing a political struggle. The government concedes that defendant's "messages contain rhetorical flourishes that are common in political speech," but then suggests, without evidence, that defendant's statements could "have been interpreted by some readers as a call for more than just a figurative struggle." ECF 36, p. 5. The government does not cite one example of defendant's tweets influencing a single person to engage in criminal conduct.

Similarly, Gov. Figure C contains a tweet from December 19, 2020, with a call to "rise up" (figuratively) and be recognized by the government. The full statement reads, "Our government no longer listens & takes instructions from the People. They've decided to become dictators to the People. It's time to rise up!" This is precisely the category of speech the First Amendment protects. It is not incitement, and barely registers above heated political rhetoric. *See generally Cohen v. California*, 403 U.S. 15, 24–26 (1971). It was also not imminent—being issued almost a month prior to January 6. *See Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969) (First Amendment prohibits punishment of advocacy except when it incites imminent unlawful action).

The government's sentencing memorandum is devoid of any mention of the First Amendment, let alone any analysis of whether defendant's statements meet the *Brandenburg* standard required for punishing speech. The government may only punish protest-related speech that includes a direct "call to violence" or advocacy that is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *See Brandenburg*, 395 U.S. at 447; *Noto v. U.S.*, 367 U.S. 290, 297–300 (1961). At the same time, the Supreme Court has consistently protected the statement of an idea that "may prompt its hearers to take unlawful action. . . ." *Noto*, 367 U.S. at 297 (quoting *Dennis v. U.S.*, 341 U.S. 494, 545 (1951) (Frankfurter, J., concurring)). Indeed, even a protestor screaming, "We'll take the f***ing street again" amidst an agitated crowd resisting police authority could not be punished for his speech. *Hess v. Indiana*, 414 U.S. 105, 107 (1973). The government fails to distinguish this important constitutional divide and, by so doing, seeks to penalize protected advocacy.

None of defendant's statements meet the test for a "call to violence" as the government suggests. They lack any specific call to violence (hypothetically, "People, find a police officer and bash his head in!" or "Attack Senator John Doe now!"). They are not particular in that they do not ask protestors to take unambiguous actions or engage in detailed criminal acts. They are not imminent—the quoted material occurred a month before the January 6 event. And whatever the government believes defendant communicated to his supporters remains an inkblot in a constitutional Rorschach test. The speech that the government finds objectionable remains protected advocacy, and should not be considered for purposes of sentencing.

### III. Defendant Did Not Engage in Violence or Encourage Anyone to Commit Violence on January 6

Defendant's conduct on January 6 must be viewed within the prism of what defendant perceived and knew at the time of the offense. Defendant was on the Capitol grounds for only 15 minuets. The events unfolded quickly and chaotically. As the government acknowledges, because defendant arrived by Metrorail at the Capitol, defendant "approached the building from the east side, avoiding the largest crowds and not seeing some of the most significant violence that day." ECF 36, p. 17. Defendant did not witness the destruction of property and violent confrontations with police occurring on the west side of the Capitol. He believed he was participating in a peaceful protest and wanted to make his voice heard at the Capitol. Vociferous political demonstrations near and inside the Capitol are commonplace, and arguably a hallmark of our open and free republic. Defendant had no way of comprehending the magnitude of the full events unfolding at the Capitol, and only understood what transpired on January 6 when watching the news later that evening in his hotel room.

Everything defendant witnessed and experienced on the Capitol Grounds was captured on video, a copy of which is attached as Exhibit 1 to the government's sentencing memorandum. When watching the video, it is apparent that defendant went to the Capitol primarily to document and share what was happening on the Capitol grounds. He was not leading a mob into the Capitol; he was in the rear of the crowd, following along and narrating what he was seeing and hearing. If anything, the defendant was being led by the crowd.

The video shows defendant's vantage point when members of the crowd removed a shield from a U.S. Capitol Police Officer. Defendant was standing at the rear of the crowd and was holding his phone far above his head to film what was happening ahead of him. Defendant did not

7

yell orders or encourage the crowd to take the officer's shield. When the crowd began yelling "take it, take it," defendant can be heard repeating the statement in a low tone to his phone to document what was being said. It was not a call to action. This is consistent with the statement of offense adopted by defendant and the government. The statement describes the event as follows, "[defendant] recorded a video of what was happening, and in the video, he *chimed* in with the crowd, saying "take it, take it." ECF 26, p. 5 at ¶ 9 (*emphasis added*).

The government admits that there "is no indication that Straka participated in removing the shield from the officer," but criticizes defendant for doing "nothing to discourage the rioters from removing the shield." ECF 36, p. 9. The government cites no duty to prevent third parties from committing criminal conduct. There is no such duty and defendant should not be subjected to a more severe sentence for failing to meet a nonexistent legal obligation.

### *Defendant's Social Media Posts on January 6*

The government falsely claims that defendant used his social media to encourage rioters to continue fighting on January 6. ECF 36, p. 11. The government writes, "Later as law enforcement was still working to clear rioters from the Capitol grounds, Straka encouraged them to continue fighting." *Id*. The only problem is that defendant's post says nothing of the sort. Defendant wrote at 5:33 pm, "Patriots at the Capitol – HOLD. THE. LINE." Defendant made this statement after he left the Capitol Grounds, but before learning about the extent of violence committed on the west side of the Capitol.

From defendant's perspective he saw large crowds of protestors peacefully gathered in front of the Capitol, waving banners and signs in support of their political message. Defendant's message was directed at those people peacefully assembled, and he was encouraging them to continue their demonstration. His call was to "Patriots" not "rioters." Defendant's message was

*not* a call for violence or to "continue fighting," as the government argues. Defendant did not write "storm the Capitol," "attack the police," or "continue fighting," which would have been direct calls for violence and outside the bounds of speech protected under *Brandenburg*.

The remainder of defendant's social media posts were similarly written before defendant saw television footage of the west side of the Capitol. These statements are also constitutionally protected speech. Defendant's commentary on a political movement not being a "revolution of ice cream cones & hair-braiding parties" is nothing more than colorful political rhetoric. Many political movements in our nation's history have used civil disobedience to call attention to their cause, including most recently, the Black Lives Matter movement. When members of this movement were burning cities and calling for violent unrest in the streets, Vice President Kamala Harris publicly declared:

> They're not going to stop and everyone beware, because they're not going to stop. They're not going to stop before Election Day in November and they're not going to stop after Election Day. Everyone should take note of that on both levels. They're not going to let up and they should not and we should not."[4]

Unfortunately, this type of heated political language has become commonplace in our politics. For example, Congresswoman Maxine Waters called for protesters to "stay on the street" and "get more confrontational."[5] Politicians like Harris and Waters make incendiary comments with impunity and face no scrutiny or legal consequences from the Justice Department. Defendant should not be punished for using similar language, regardless of his political affiliations.

---

[4] Thomas Barrabi, *Flashback: Kamala Harris said nationwide protests are 'not going to stop'*, Fox News, September 24, 2020, https://www.foxnews.com/politics/flashback-kamala-harris-nationwide-protests-not-going-to-stop.

[5] Chandelis Duster, *Waters calls for protesters to 'get more confrontational' if no guilty verdict is reached in Derek Chauvin trial*, CNN, April 19, 2021, https://www.cnn.com/2021/04/19/politics/maxine-waters-derek-chauvin-trial/index.html.

**IV.     Defendant Disavowed Violence Committed on January 6**

The government incorrectly claims that defendant showed a "lack of remorse" in the aftermath of January 6, and that there was "no indication that Straka used his social media to disavow what occurred on January 6 prior to meeting with agents." ECF 36, p. 19. This is simply not true. Defendant was arrested on January 25, 2021, and first met with federal agents on February 17, 2021. Eight days after January 6, and 34 days *before* his meeting with agents, defendant published the below tweet disavowing all violence:


Def. Figure A

Defendant unequivocally disavowed all forms of violence using his social media account. Despite this clear condemnation, the government repeatedly faults defendant for failing to use his platform to adequately "denounce his conduct and the conduct of the rioters." ECF 36, p. 13.

Additionally, as the government acknowledges, defendant removed the videos he posted on January 6 because after learning of the magnitude of violence committed on the west side of the Capitol he felt "ashamed" and did not want to be perceived as supporting violence. ECF 36, p.

10

13. Defendant removed his post long before his arrest and interview with agents. Defendant demonstrated his remorse by acknowledging his wrongdoing and by immediately agreeing to be interviewed by agents after his arrest. The defendant does not excuse his presence on the restricted Capitol Grounds and accepts full responsibility for his conduct on January 6. Defendant's admission to engaging in disorderly conduct should not, however, serve as a basis to blame defendant for the violent attack on the Capitol committed by a select group of criminal actors.

Defendant also expressed sincere remorse for his conduct during his interview with U.S. Probation. He explained that "if he could go back in time, he would never have gone to Washington, D.C." He wishes he would have stayed in Georgia to assist with the run-off election for U.S. Senate. Defendant regrets his presence on the Capitol Grounds and has suffered tremendous consequences both in his personal and professional life.

V.     **Defendant is Not Responsible for the Breach of the Capitol**

One of the most absurd arguments advanced by the government is that "but for" defendant's actions the "riot likely would have failed." ECF 36, p. 3. The government argues that because defendant was present at the Capitol, along with a large number of others, he bears responsibility for overwhelming law enforcement, breaching the Capitol, and disrupting the Joint Session of Congress. Putting aside the fact that defendant is not responsible for the criminal conduct of others, the government has not charged defendant with any of those crimes. He is charged with misdemeanor disorderedly conduct based on his personal actions. There was no conspiracy. This was a demonstration that unfortunately spiraled out of control.

If the government was sincere about analyzing the factors contributing to the breach of the Capitol, then they would examine all the factors. The government fails to acknowledge the serious security failures that occurred on January 6. To be clear, defendant does not seek to assign blame

11

for the Capitol breach to security and intelligence agencies, but the government's misleading claims that the riot would have likely failed but for defendant's actions necessitate a rebuttal and review of the government's own findings regarding security failures at the Capitol on January 6.

A 127-page bipartisan Senate report concluded that security and intelligence failures at every level of government "allowed for the breach of the Capitol" on January 6.[6] Specifically, the report determined that:

- The Federal Intelligence Community—led by the Federal Bureau of Investigation (FBI) and Department of Homeland Security (DHS)—did not warn of a potential for violence on January 6th.

- USCP intelligence components failed to convey the full scope of threat information they possessed.

- USCP was not adequately prepared to prevent or respond to the January 6th security threats, which contributed to the breach of the Capitol.

- Opaque processes and a lack of emergency authority delayed requests for National Guard assistance.

- The intelligence failures, coupled with the Capitol Police Board's failure to request National Guard assistance prior to January 6th, meant the District of Columbia National Guard (DCNG) was not activated, staged, and prepared to quickly respond to an attack on the Capitol. As the attack unfolded, the Department of Defense (DOD) required time to approve the request and gather, equip, and instruct its personnel on the mission, which resulted in additional delays.

---

[6] A full copy of the Senate report can be accessed at
https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.CapitolAttack.pdf.

But for *these* security failures, the riot would have likely failed. The government cannot ignore this evidence to advance its "but for" narrative against defendant. While there is plenty of blame to spread around, assigning blame for the events of January 6 should not factor into the Court's determination of an appropriate sentence for defendant.

**VI.     The Government's Sentencing Recommendation Would Create a Significant Sentencing Disparity**

The government acknowledges that it has made "meaningful distinctions between offenders," and that "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct…does apply." Here, the government's recommended sentence seeks to impose a harsher sentence for lesser conduct, apparently because of defendant's history of public political activism. The government also continues to allude to the fact that the Capitol breach was a mass crime – implying the need for mass punishment, which is contrary to constitutional principles.

The cases cited by the government do not support the government's recommended sentence. The government cites *United States v. Jessica Bustle*, 21-cr-238-TFH in support of its contention that defendant should be sentenced to a 4-month period of home confinement. Bustle *entered* the Capitol for 20 minutes, was charged with a separate offense for doing so, and bragged about entering the Capitol. Conversely, defendant did not enter the Capitol and was appropriately charged with a different crime precisely because his conduct was different. Unlike Bustle, defendant did not attempt minimize and justify the rioters conduct – he specifically disavowed violence after he learned the full scope of the events of January 6. Despite these differences, and contrary to their stated goal of avoiding unwarranted sentencing disparities, the government seeks to impose a harsher sentence on defendant for lesser conduct.

The government also cites *United States v. Andrew Bennett*, 21-cr-227-JEB. Like Bustle and unlike defendant, Bennett entered the capitol for 25 minutes and was charged for doing so. Bennett also bragged about his unlawful entry and had five previous criminal convictions. The court in Bennet also determined that he intended to do more than watch the rally. Not only did defendant not enter the Capitol, he also has no criminal record.

While the government cites to these cases as comparable to the case before this Court, they are obviously distinguishable. They also highlight the government's attempt to impose a sentence on defendant harsher than the sentences imposed on others whose conduct was admittedly more egregious. In order to accomplish the government's stated goals of avoiding sentence disparities and making meaningful distinctions between offenders, the Court should do just that and impose a lesser sentence on defendant.

### VII. Conclusion

Defendant respectfully requests the Court to consider only his conduct related to the offense in determining the appropriate sentence. Based on the foregoing, and defendant's sentencing position previously filed, defendant believes a sentence of time served for the two days he has already served in jail, or a short term of house arrest coupled with community service, would be sufficient but not greater than necessary in this matter.

Respectfully submitted,

/s/ Bilal A. Essayli
Bilal A. Essayli
ESSAYLI & BROWN LLP
18191 Von Karman Ave., Ste. 100
Irvine, CA 92612
Telephone: (949) 508-2980
bessayli@essaylibrown.com

*Counsel to Defendant Brandon J. Straka*