IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:21CR-579-DLF |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S** |
| vs. | ) | **SENTENCING MEMORANDUM** |
| | ) | |
| BRANDON STRAKA, | ) | |
| | ) | |
| Defendant. | ) | |

**TABLE OF CONTENTS**

I.   INTRODUCTION AND DEFENDANT'S SENTENCING REQUEST ......................... 2

II.  NATURE OF THE OFFENSE ................................................................................... 2

III. MR. STRAKA'S HISTORY AND BACKGROUND ......................................................... 4

IV.  ARGUMENT ............................................................................................................. 6
   A. STATUTORY PENALTIES ............................................................................................ 6
   B. ADVISORY GUIDELINES .............................................................................................. 6
   C. A SHORT SENTENCE OF HOUSE ARREST, EXTENSIVE COMMUNITY SERVICE, AND THE PAYMENT OF RESTITUTION RESULT IN A SENTENCE CONSISTENT WITH THE FACTORS SET FORTH IN 18 U.S.C § 3553(a) ................. 6

V.   CONCLUSION ....................................................................................................... 14

1

## I. INTRODUCTION AND DEFENDANT'S SENTENCING REQUEST

On October 6, 2021, Defendant Brandon Straka ("Brandon") entered a plea of guilty to one count of misdemeanor Disorderly or Disruptive Conduct on the Capitol Grounds to Disturb or Disrupt the Orderly Conduct of either House of Congress in violation of 40 U.S.C. § 5104(e)(2)(D). The Defendant respectfully requests that he be sentenced to either a terminal disposition of time served for the two days he has already spent in custody, or in the alternate, a term of home confinement and community service. Defendant requests that he not be placed on probation. Defendant also requests that the Court impose the maximum fine permitted for this offense, which is $5,000.

## II. NATURE OF THE OFFENSE

Brandon had an extremely unique role on January 6 at the Capitol, as will be evinced by the following discussion of the nature of the offense.

On December 19, 2020, following the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the results.[1] The rally was set for January 6, 2021, the same date Congress was set to certify Joe Biden as the winner of the presidential election. Prior to the January 6, 2021 rally at which then-President Donald Trump was set to speak, Brandon was set to speak at a rally held at Freedom Plaza on January 5, 2021 and travelled to Washington, D.C. for that purpose. Brandon remained in Washington, D.C. after the rally on January 5, 2021, as he was a potential slated speaker at a rally the next day. On the morning of January 6, 2021, Brandon arrived at the Ellipse at 5:00 a.m. in anticipation of then-President Trumps' rally to start. Up until the time Brandon arrived at the event, he believed that he might speak at that event.

---

[1] President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!" *See* Dan Barry and Sheera Frenkel, *'Be There. Will be Wild!': Trump All but Circled the Date*, The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

2

Brandon also planned on speaking at an event that was being held on the United States Capitol Grounds after the conclusion of President Trump's rally; and his plan was to go to the Capitol after President Trump's rally to speak. Brandon understood that this rally would be on the Capitol Grounds, but did not know exactly where.

When President Trump concluded his remarks around 1:00 p.m., a wave of protestors left the Ellipse and headed toward the Capitol. At this time, Brandon left the Ellipse and traveled to the Willard Hotel to meet with two of his employees who were designated as security guards. Upon the advice of his security guards, Brandon did not participate in the march to the Capitol and instead took the Metro to the Capitol. While riding on the Metro, Brandon began receiving push notifications on his phone about what was happening at the Capitol. The Metro did not stop at the Capitol, and Brandon got off at the next stop—which was roughly an 18-minute walk from the Capitol.

By the time Brandon arrived, at around 2:40 p.m. (a full twenty minutes after the Capitol had been cleared), the outer barriers and fencing that had previously surrounded the Capitol were largely displaced. Brandon arrived and approached the East side of the Capitol, where things were calmer; and Brandon did not notice anything out of the ordinary during most of his walk to the Capitol. Brandon observed people milling around, with some protesting and/or holding signs as he began to approach the throng of people near the East side Capitol stairs. There were no police officers visible on the East side of the Capitol grounds during his walk onto the grounds, and no closed barriers or closed barricades could be seen. The pathways to the Capitol building were fully open and people were calmly wandering around these pathways in all directions. Brandon began filming the scene on his iPhone. As he ascended the stairs and got closer to the entrance, Brandon began to encounter a rowdier and more chaotic scene. Brandon did not see any police officers, closed barriers, or tape that indicated that he should not be in the area as he ascended the stairs.

3

As Brandon walked up the stairs, he saw a man at the top who appeared to be a protestor, waving to the crowd below in a summoning manner and shouting, "We're going in! They've opened the doors! The doors are open!" Brandon can be heard on the video repeating the words of the man for purposes of highlighting that activity to the video's audience. Brandon says, "They seem to be summoning people to go inside. 'We're going in.' They're saying, 'We're going in.'"

For a few minutes, Brandon filmed the scene with his camera held aloft over his head with both hands as he was unable to see much of the activity happening in front of him due to many of the protestors in front of him being much taller than him and carrying large flags hanging down from tall flagpoles. Brandon observed a man come out of the Capitol who stated that everyone should turn around, so Brandon turned around and began his descent of the stairs of the East side of the Capitol. Brandon never entered the Capitol Building. After the scene on the steps, Brandon spent some more time interviewing others about their experiences that day. He then uploaded the video from the steps to Twitter.

Brandon removed both the video and the remarks he made via Twitter within hours of posting them after he returned to his hotel room and saw footage on the news which made him realize the extent of the damage that occurred at the Capitol. Brandon did not remove the content for fear of being arrested but rather because he was ashamed about being associated with what he saw on the news reports. Brandon initially thought that his observation of what happened at the Capitol was a protest; and was appalled when he learned that others had destroyed property and committed acts of violence.

### III.    MR. STRAKA'S HISTORY AND BACKGROUND

Brandon Jerrard Straka was born on December 16, 1976 in O'Neill, Nebraska to the union of Dan Straka and Mary Straka. Brandon had a largely normal and active childhood with involved parents, although it was socially difficult for him to be gay in his small farming community. (PSIR

¶38). Brandon was an excellent student and was active in his school and 4H Club. A few years after graduating from high school, Brandon moved to New York City, where he resided for nearly the next twenty years, from 2000 to 2020. (PSIR ¶40). In 2014, Brandon earned his degree in cosmetology from the Aveda Institute. (PSIR ¶52). In January of 2015, Brandon took a huge positive step in his life and joined Alcoholics Anonymous. He has remained sober for nearly seven years after facing difficulties with alcohol and cocaine throughout his twenties and early thirties. (PSIR ¶50). Brandon has been very open about his struggles in this arena in order to relate to and inspire others.

In January of 2019, Brandon formed the #WalkAway Foundation, which is a non-profit organization dedicated to understanding the political divide and seeking to unite individuals with differing views. (PSIR ¶57). For Brandon, this meant his leaving of the Democratic Party and the creation of a safe space for those who, like him, did not feel that liberalism represented them. This video created a cascade of opportunity for Brandon to speak in various capacities across the country, making connections and volunteering for causes important to him as he did so. The relationships that he has cultivated through this work have been extremely important to the people who have felt unmoored or unable to politically connect with their families and friends. The letters of support speak for themselves as to the impact Brandon has created.

Since January 6, Brandon has spent a lot of hard time reflecting on his role in the events that took place that tragic day. He has offered strong condemnation for any violence used that day, especially the violence perpetrated against police. Additionally, Brandon has been actively using his platform to support law enforcement officers. Upon visiting the #WalkAway Foundation website, the first option presented is to donate to the "Refund the Police" initiative: "#WalkAway will donate 75% of the funds raised to pro-police organizations in [the fourteen (14) cities most affected by defunding initiatives]. The other 25% will be used for the cost of overhead for this

campaign."[2] This initiative will close at the conclusion of this year; and is close to having raised over $18,000.00 at this time. (Exhibit B).

IV. **ARGUMENT**

A. **STATUTORY PENALTIES**

Disorderly or Disruptive Conduct on the Capitol Grounds to Disturb or Disrupt the Orderly Conduct of either House of Congress is a violation of 40 U.S.C. § 5104(e)(2)(D) and carries a maximum sentence of six (6) months of imprisonment pursuant to 40 U.S.C. § 5109(b); a fine of not more than $5,000 pursuant to 18 U.S.C. § 3571(b)(6); a term of Supervised Release of not more than one year pursuant to 18 U.S.C. § 3583(b)(3); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

B. **ADVISORY GUIDELINES**

Disorderly or Disruptive Conduct on the Capitol Grounds to Disturb or Disrupt the Orderly Conduct of either House of Congress is a violation of 40 U.S.C. § 5104(e)(2)(D) and a Class B Misdemeanor as defined by 18 U.S.C. § 3559(a)(7). Accordingly, pursuant to U.S.S.G. § 1B1.9, the sentencing guidelines do not apply to this case.

C. **A SHORT SENTENCE OF HOUSE ARREST, EXTENSIVE COMMUNITY SERVICE, AND THE PAYMENT OF RESTITUTION RESULT IN A SENTENCE CONSISTENT WITH THE FACTORS SET FORTH IN 18 U.S.C § 3553(a)**

In Sentencing Memoranda put forward in various Capitol cases, the Government has indicated that there are a variety of specific factors that should be considered in determining the severity of a sentence warranted for this type of offense. In *United States v. Ehrke*, 21-cr-97-PLF,

---

[2] *See* #WalkAway Foundation Homepage last accessed Dec. 14, 2021, available at https://www.walkawayfoundation.org/.

Document 20 at page 7, the Government indicates that nine factors, while noting that they are not dispositive or exhaustive, should be considered:

1) Whether, when, and how the defendant entered the Capitol building.

    a. Brandon did not enter the Capitol building.

2) Whether the Defendant engaged in any violence or incited violence.

    a. Brandon did not commit any acts of violence, and there is no evidence that any of Brandon's statements at the Capitol caused any third party to commit an act of violence. Brandon was in the back of a crowd and simply repeated what others were chanting to memorialize the events on his video recording.

3) Whether the Defendant engaged in any acts of destruction.

    a. Brandon did not engage in any acts of destruction; as he was filming the event in a journalistic capacity.

4) The Defendant's reaction to acts of violence or destruction.

    a. Brandon turned around and left when he heard someone say that it was time to leave, despite the fact that others around him continued forward toward the Capitol door even after being told they should leave. Brandon did not personally witness the acts of violence that were broadcast on television.

5) Whether during or after the riot, the Defendant destroyed evidence.

    a. Brandon never destroyed any evidence. He removed his video from social media hours after posting it after realizing what had occurred on January 6 so that he did not appear to be supportive of violence committed, but this video was never destroyed or deleted.

6) The length of the Defendant's time inside of the building, and exactly where the defendant traveled.

7

    a. Brandon never entered the building. His approach to the building was on the East side. The initial breach occurred on the West side of the Capitol building. He spent roughly half an hour to an hour on the Capitol Grounds.

7) The Defendant's statements in person or on social media.

    a. Brandon made statements on social media that were in retrospect irresponsible and potentially inflammatory. Any statements Brandon made must be considered in context with the fact that Brandon had not witnessed the violence committed on the west side of the Capitol and he had not seen what was broadcasted on television. Once understanding the full context of the events, Brandon retracted and removed his prior statements.

8) Whether the Defendant cooperated with, or ignored, law enforcement.

    a. Brandon cooperated fully with law enforcement, including providing two proffers and turning over the password to all devices seized as part of the search warrant executed on his apartment. Brandon provided information on individuals the government was investigating in separate cases and answered all questions posed by the government.

9) Whether the Defendant otherwise exhibited evidence of remorse or contrition.

    a. Brandon has not only exhibited evidence of contrition; he has taken proactive steps to make whole those who have been hurt by his actions. His "Refund the Police" initiative shows how dedicated he is to providing recompense to those who may have been affected, directly or indirectly, by his actions on January 6, 2021.

The nature and circumstances of the offense and Brandon's history and characteristics have been set forth above. Another 18 U.S.C. § 3553(a) consideration is the need to promote respect for

the law, to provide just punishment, and to afford adequate deterrence. Between the time of Brandon's arrest and his initial appearance on the Complaint, Brandon spent approximately two days in jail. As the Court knows, for an individual that has no prior criminal history or interactions with law enforcement and the penal system, any period of incarceration can be eye-opening and serve as a deterrent to future criminal conduct. Brandon, although he knows that he broke the law in this instant offense, has no history of disorderly conduct in the years of demonstrations that he was part of and organized prior to this offense. In fact, he was a stickler about following the rules and obtaining proper permits. The fact that this is a blip on an otherwise long list of peaceful demonstrations shows that Brandon is not a future threat and that deterrence of future criminal conduct is not an issue needing resolved in this matter.

One important aspect of promoting respect for the law is encouraging cooperation and truthfulness with law enforcement. Here, following his arrest, Brandon cooperated with law enforcement by proffering on two occasions, by providing relevant media and leads, and by providing passcodes to the devices that were seized as part of the investigation.

Additionally, Brandon has expressed extreme remorse for his actions. In his lengthy letter the Court, Brandon states:

> The very next day I told all of my followers that I had made some very irresponsible comments about the Capitol riot without knowing all the facts and that I regretted making those comments and was embarrassed to think anybody might read them and think I supported any of the violence or vandalism that we were now seeing.
>
> To be clear, Your Honor, I think January 6th is nothing more than an incredibly shameful day that had absolutely no positive attributes whatsoever. Nothing positive was accomplished. If I had just made the choice to stick with my

plan of poll watching in Georgia, my life would be completely different today. Instead, I got swept into a horror show that has turned my life upside down and caused unspeakable destruction. . . . I'm sorry that I was present in any way at an event that led people to feel afraid, that caused shame and embarrassment on our country, and that served absolutely no purpose other than to further tear away at the already heartbreaking divide in this country.

    I want to apologize to all members of the Capitol Police whose safety was put in danger by the unruly mobs. In particular, the police officer who is seen in my video whose shield was being taken by the crowd. No protest should ever get out of hand to the point of becoming a riot, and no police officer should ever have to feel that their life or their safety is in jeopardy while trying to keep the peace at a public demonstration.

    And I want to apologize to every member of Congress, regardless of political affiliation or background. I'm deeply sorry and ashamed for being present at an event that sent members of Congress running in fear to evacuate a building. I can sincerely say that I would never intend for such a thing to happen, but nonetheless, it did. And I was there. And I'm truly sorry for that. (Exhibit #A).

Brandon's prior seeming bravado, as set forth in his social media postings immediately after January 6, appears to have been tempered by a realization of the consequences of his actions.

If the Court would allow Brandon to have included in his sentence a stronger portion of community service rather than a sentence of Probation, the country at large will be better served. The nature of Brandon's job requires that he often travels, making supervision more difficult and costly—and to what end? Brandon has already been on Pretrial Release for nearly a year with no violations. He clearly has the capability to contribute to the greater good through fundraising and

leading others into service with him. While the Probation Office's Recommendation sees Brandon's following as a reason for concern[3], it is the Defendant's belief, and Counsel for the Defendant's belief, that his talents can be put to better use than verifying that he is in compliance with certain conditions of Probation—that if he is given true freedom, that he will use that freedom in service of his country.

As an additional consideration for foregoing a sentence of Probation, collateral consequences are within the scope of the Court to consider under 18 U.S.C § 3553(a). *See United States v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. 2016). ". . . [S]ufficient attention has not been paid at sentencing to the collateral consequences facing a convicted defendant." *Nesbeth*, 188 F.Supp.3d at 180. Prior to even being sentenced, Brandon has faced many collateral consequences in the form of lost business opportunities, placement on the TSA terrorist watch list and corresponding public humiliation, and media speculation of cooperation with the government — leading to more public humiliation and threats, his "de-platforming" by various social media and payment processing websites, and his eviction from his apartment, to name a few. That these consequences have been or will be suffered by the Defendant is sometimes unavoidable and, in many estimations, warranted. This is not the issue. Defendant's position is that the magnitude of these collateral consequences should be considered as part of a whole when determining the appropriate sentence to impose.

Additionally, the need to avoid unwanted sentencing disparities is of major importance in this case. When examining other cases in which the Defendant has been sentenced to the same sentence being recommended by Probation in the instant matter, the disparity in actual conduct is alarming. Take the case of *United States v. Jones*, 1:21cr-321-JEB, as an example. In this case, the

---

[3] The government has never alleged, and there is no evidence, that Brandon used his following to commit any criminal activity. Brandon is charged for conduct he committed at the Capitol in his personal capacity.

11

Defendant entered the Capitol through the Senate Wing and continued to take pictures and film inside of the Capitol; remained inside the Capitol for approximately fifteen minutes; leaving only after being subjected to tear gas administered by law enforcement officers. What specially differentiates Jones's conduct from the instant matter is that Jones *observed* individuals removing barricades erected to prevent entry into the U.S Capitol, then *scaled a wall* to access the first floor of the Capitol's exterior, then *entered the Capitol* and filmed the destruction and chaos inside.

Because there is only a small pool of cases to draw from in determining whether a certain defendant's conduct is aggravating or mitigating, the above case is offered to show what conduct has been viewed as punishable by the same Sentencing Recommendation that has been set forth by Probation in the instant matter. In *Jones*, the Government concedes that the Government has requested incarceration in cases in which defendants have scaled the Capitol and that this conduct is an aggravating factor that the Courts have considered when imposing sentencing. If, on balance, Jones was sentenced to three months of home detention, three years' probation, no less than 60 hours of community service, and $500 in restitution; then how does Brandon's conduct compare? How does his show of remorse compare? How do his fundraising efforts compare? How do the collateral consequences he has faced compare?

Another sentence of note is that in *United States v. Doyle*, 1:21-cr-324-TNM, in which the Defendant received a sentence of two months' probation, a $3,000 fine, and $500 in restitution. In *Doyle*, the Defendant entered the Capitol building by climbing through a broken window. She stayed in the Capitol for over twenty minutes, at one point being stopped by a law enforcement officer, at which she either yelled or chanted and then continued about her business. The Defendant observed individuals climbing on scaffolding, climbing through windows to enter the Capitol, and individuals dressed in military-style clothing. This conduct is much different than Brandon's brief

encounter outside of the Capitol building on the East side, in which he turned around left when instructed.

It seems that the sentence recommended in this case is a standardized recommendation by the Probation Office; and it therefore fails to take into account the specifics of the instant matter. For example, this same sentencing recommendation was also made in *United States v. Cordon*, 1:21-cr-269-TNM. The conduct in *Cordon* involved the Defendant wearing body armor, carrying a gas mask, observing altercations between police and rioters, stepping through a broken window into the Capitol building, and then spending five minutes inside the Capitol building. For this offense, Cordon received two months' probation and a $4,000.00 fine. Brandon's behavior was far less problematic and far less premeditated than Cordon's behavior.

Even more to the point is the case of Cordon's brother, Kevin Cordon at *United States v. Cordon*, 1:21CR-277-TNM. Kevin Cordon's time at the Capitol went much the same way that his brother's did, save for Kevin gave an interview to a Finnish reporter after exiting the Capitol. In this interview, Kevin stated, "We're here to take back our democratic republic. It's clear that this election is stolen, there's just so much overwhelming evidence and the establishment, the media, big tech are just completely ignoring all of it. And we're here to show them we're not having it. We're not-we're not just gonna take this laying down. We're standing up and we're taking our country back. This is just the beginning." This interview can still be accessed online today.[4] Kevin received a sentence of 12 months' probation, 100 hours community service, a $4,000.00 fine, and $500.00 in restitution.

Brandon also objects to the recommendation by the Probation Officer that he be subjected to a discretionary condition of Probation that monitors his electronic communications service

---

[4] https://www.is.fi/ulkomaat/art-2000007723759.html, last accessed December 15, 2021.

13

accounts, including email accounts, social media accounts, and cloud storage accounts. Brandon also objects to his financial activity being monitored by the Probation Office. These discretionary conditions of Probation are not sufficiently relevant to the offense committed. In *United States v. Taylor*, 796 F.3d 788 (7th Cir. 2015), the Seventh Circuit reversed a restriction on the defendant's computer ownership and internet access in a bank larceny case, stating that the restriction was not reasonably related to his prior conviction for incest. In Brandon's case, emailing, using social media, and using cloud storage has nothing to do with his offense.

## V. CONCLUSION

It is the wish of the Court, society and the Defendant, Brandon Straka, that he is granted a sentence that enables him to justly recompensate for his wrongdoings and allows him to remain in the community as a productive, law-abiding, and rehabilitated citizen. A sentence of a short term of either credit for time served or house arrest, coupled with an extensive requirement of community service with a Court-ordered fine and restitution is sufficient but not greater than necessary in the present matter to accommodate this desire.

Respectfully submitted,

/s/ Bilal A. Essayli
Bilal A. Essayli
ESSAYLI & BROWN LLP
18191 Von Karman Ave., Ste. 100
Irvine, CA 92612
Telephone: (949) 508-2980
bessayli@essaylibrown.com

*Counsel to Defendant Brandon J. Straka*