```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                           FOR THE DISTRICT OF COLUMBIA
 2

 3      UNITED STATES OF AMERICA,          .
                                           .   Case Number 21-cr-579
 4                 Plaintiff,              .
                                           .
 5           vs.                           .
                                           .
 6      BRANDON STRAKA,                     .   January 24, 2022
                                           .   11:10 a.m.
 7                 Defendant.              .
        - - - - - - - - - - - - - - - - -

 8

 9                       TRANSCRIPT OF SENTENCING HEARING
                     BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                        UNITED STATES DISTRICT JUDGE

11      APPEARANCES:

12      For the United States:        BRITTANY REED, AUSA
                                      United States Attorney's Office
13                                    650 Poydras Street, Suite 1600
                                      New Orleans, Louisiana 70130
14
        For the Defendant:           BILAL ESSAYLI, ESQ.
15                                    Essayli & Brown LLP
                                      18191 Von Karman Avenue, Suite 100
16                                    Irvine, California 92612

17                                    STUART J. DORNAN, ESQ.
                                      Dornan, Troia, Howard, Breitkreutz,
18                                       Conway & Dahlquist, PC
                                      1403 Farnam Street, Suite 232
19                                    Omaha, Nebraska 68102

20      Official Court Reporter:      SARA A. WICK, RPR, CRR
                                      United States District Court
21                                       for the District of Columbia
                                      333 Constitution Avenue Northwest
22                                    Room 4704-B
                                      Washington, D.C. 20001
23                                    202-354-3284

24
        Proceedings recorded by stenotype shorthand.
25      Transcript produced by computer-aided transcription.
```

1                    P R O C E E D I N G S

2        (All participants present via video conference.)

3            COURTROOM DEPUTY:  Your Honor, we are in Criminal

4    Action 21-579, United States of America versus Brandon Straka.

5        If I can have the parties identify themselves for the

6    record, beginning with the United States.

7            MS. REED:  Good morning, Your Honor.  AUSA Brittany

8    Reed on behalf of the United States.

9            MR. DORNAN:  Good morning, Your Honor.  Stuart Dornan

10   on behalf of Mr. Straka, who voluntarily appears by video

11   conference.

12           MR. ESSAYLI:  Good morning, Your Honor.  Bilal Essayli

13   on behalf of Mr. Straka.

14           PROBATION OFFICER:  Good morning, Your Honor.  Jessica

15   Reichler on behalf of the Probation Office.

16           THE COURT:  We are here for sentencing.  And while I

17   don't need to make a finding under the CARES Act, I do want to

18   confirm with Mr. Straka himself that he does wish to appear

19   today by video conference rather than wait until a time that he

20   can appear in person before me in the courtroom for sentencing.

21       Mr. Straka, your attorney has indicated that you would like

22   to proceed by way of video conference, before he has indicated

23   because of COVID and your desire to get this case resolved.  I

24   just want to confirm with you before we proceed that that's

25   correct and you don't want to wait until you can appear in

```
 1    court.
 2              THE DEFENDANT:  Yes, Your Honor.
 3              COURTROOM DEPUTY:  Your Honor, we're having trouble
 4    hearing you.
 5              THE COURT:  Okay.  Just one moment.
 6         All right.  Is that better?
 7              COURTROOM DEPUTY:  Yes, Your Honor.
 8              THE COURT:  Let me know if the sound trails off.
 9         I was asking, who will be speaking for the defense?  Is
10    that Mr. Dornan, or is that Mr. Essayli?
11              MR. ESSAYLI:  I will be speaking for the defense
12    today, Your Honor.
13              THE COURT:  So Mr. Essayli, I just want to make sure
14    that you or Mr. Dornan have reviewed the presentence report with
15    Mr. Straka?
16              MR. ESSAYLI:  Yes, Your Honor.
17              MR. DORNAN:  That's correct, Your Honor.
18              THE COURT:  And Mr. Straka, have you had adequate time
19    to review the report and discuss it with your attorney?
20              THE DEFENDANT:  Yes, Your Honor.
21              THE COURT:  Have you had a chance to correct any
22    errors in the report?
23              THE DEFENDANT:  Yes, Your Honor.
24              THE COURT:  Are you satisfied with your attorneys'
25    services in this case?
```

 1          THE DEFENDANT:  Yes, Your Honor.

 2          THE COURT:  And have you also had a chance to review

 3   all of the filings in this case, including all the memoranda

 4   that have been submitted to the Court and the exhibits in

 5   connection with the sentencing?

 6          THE DEFENDANT:  Yes, Your Honor.

 7          THE COURT:  Mr. Essayli, are there any unresolved

 8   objections or factual inaccuracies to the presentence report?

 9          MR. ESSAYLI:  Not to the facts, Your Honor.  If we get

10   to a sentence that includes probation, I would like to be heard

11   on the conditions proposed, but no factual objections to the

12   sentence at this point -- or to the presentence report, rather.

13          THE COURT:  Does the government have any objections to

14   the report?  You're on mute.

15          MS. REED:  I'm sorry.  No objections, Your Honor.

16          THE COURT:  All right.  I will accept the presentence

17   report as my findings of fact pursuant to Rule 32 of the Federal

18   Rules of Criminal Procedure.  Consistent with Section 1B1.9 of

19   the guidelines, the guidelines do not apply to this petty

20   offense which is a Class B misdemeanor.  So I will consider the

21   factors set forth in Title 18 United States Code Section 3553(a)

22   in deciding the appropriate sentence in this case.

23      Ms. Reed, I will begin with you and give you a chance to

24   allocute on behalf of the United States.

25          MS. REED:  Thank you, Your Honor.  I think I'm off

1    mute this time.

2              THE COURT:  Yes.

3              MS. REED:  Your Honor, the government has had an

4    opportunity to view all of the evidence in this case, and that

5    does include the mitigation evidence that has been offered by

6    Mr. Straka as well.  And while preparing for this hearing today,

7    I was going back through the presentence report, and one thing

8    struck me that I think is important for this Court to consider

9    when this Court is fashioning a sentence for Mr. Straka.

10             So on page 7, Your Honor, paragraph 23 of the presentence

11   report, Mr. Straka notes that he feels the consequences of his

12   actions thus far have been quite extreme, given the fact that

13   this is a misdemeanor.

14             Now, I do want to put that in proper context, because prior

15   to that, on the previous page, it does state that Mr. Straka did

16   express remorse.  In fact, he stated that this was something

17   that was one of the stupidest and most tragic decisions of his

18   life.  So I don't want to diminish the fact that he has, the

19   government believes, expressed remorse.

20             However, to say the least, the fact that this is a

21   misdemeanor does not by any means project that what happened on

22   January 6 in the larger context, of which Mr. Straka was

23   obviously a part, a significant part of that, was insignificant,

24   but it also should not -- should not subject that because the

25   government has charged Mr. Straka with a misdemeanor, that his

1    own conduct on that day was insignificant.

2         As the Court knows from what has been offered, Mr. Straka

3    did not enter the Capitol.  We don't dispute that.  We don't

4    dispute that he did not physically engage with a police officer,

5    although we do believe that the record shows that he, obviously,

6    observed the police officer struggle to maintain his physical

7    shield while rioters were attempting to take that away from him.

8    We don't deny the fact that Mr. Straka did not participate in

9    any of the physical damage to the Capitol on that day.

10        But nonetheless, the conduct that he demonstrated on that

11   day was significant.  And we've highlighted that in our

12   aggravating factors for why we have asked for a sentence of home

13   detention as well as probation.

14        And so Your Honor, I believe that if the Court were to take

15   all of that into totality, the Court will find that the

16   government's request in this case is certainly reasonable.

17        Starting before Mr. Straka even arrived at the Capitol on

18   January 6, he predicted that this was going to happen.  Not only

19   did he predict it, he encouraged it, and he incited it by the

20   words that he used going back to December of 2020.

21        At that time Mr. Straka mentions the fact that a -- that

22   the time was coming for a civil war, that there was a revolution

23   that was at play.  Mr. Straka indicated days before,

24   specifically the day before, that if the election results

25   weren't going to be certified in the way that he and others had

1    hoped, that there was going to be a consequence for that.

2         And we saw that consequence tied specifically to

3    Mr. Straka's conduct, and we saw that tied to the conduct of the

4    other rioters who went to the Capitol on January 6.

5         And I'm not going to belabor this point.  I know Your Honor

6    has heard a number of cases about the overall violence that

7    happened that day.  You've also seen the video evidence that the

8    government has presented.  But Mr. Straka's attempt to minimize

9    his conduct on that day is certainly not appropriate, given what

10   happened.

11        Yes, he arrived at the east front of the Capitol and may

12   not have witnessed the overwhelming violence that was happening

13   at the west side of the Capitol.  But this is what we do know:

14   When he got there, someone who has hundreds of thousands, I

15   believe he may have mentioned millions, of followers in his

16   Twitter account because of his association and affiliation with

17   the #WalkAway Foundation, Mr. Straka took that opportunity once

18   he hit those steps of the Capitol to encourage people to enter

19   by yelling "go, go, go," or saying "go, go, go" if he did not

20   yell it, to people who were attempting to enter Capitol, to say

21   we are going into the Capitol.  He cannot dissociate himself

22   from the individuals who did go inside because he encouraged

23   them to do so.

24        Not only did he encourage them to do so, as he was video

25   recording this that he would later post to all of his viewers

and his followers, he sees an officer who was struggling to
maintain his shield.  Mr. Straka then at that time said "take
it, take it" as the rioters are attempting to take the shield
away from the officer, and after they're successful in doing
that, they're yelling and chanting "USA."

Mr. Straka not at that time decides to leave the Capitol.
What does he do?  He decides to press forward to the doors of
the east rotunda.  He presses forward so close enough that he is
within 10 to 20 feet of what is happening inside of that
building.  And while there is no dispute that he did not go
inside, the government submits that the only reason he did not
go inside was because of the tear gas that met him as he got
closer to those steps and closer to the door.

But certainly by that time, Mr. Straka did witness the
violence that happened with that police officer whose shield was
attempted to be taken away from him, and he certainly also would
have heard the alarms inside of the Capitol that would have been
suggesting to people that they did not belong, that they
shouldn't have been there, that they should not have entered,
that they should no longer enter.  And he would have witnessed
the violence that was going on inside as relates to other police
officers who are now attempting to have other individuals not
enter the Capitol.

And at that time what does Mr. Straka do?  He continues to
record this.  And he leaves the Capitol that day having now an

1    appreciation of the seriousness of what happened.  No, maybe he

2    didn't know that people had lost their lives.  No, maybe he

3    didn't know all of the destruction that was going on that day.

4    But something should have registered inside Mr. Straka that what

5    he observed in and of itself was serious enough for him to not

6    condone it but to dismiss it, to use his platform to do that.

7         And what did he do?  After leaving the Capitol, while

8    police officers are still attempting to rid people inside of the

9    Capitol off of the Capitol grounds, Mr. Straka sends out a plea

10   telling individuals to hold the line.

11             THE COURT:  That tweet was sent at 5:33 p.m.?

12             MS. REED:  That is correct, Your Honor.

13             THE COURT:  And what time do you think he left the

14   Capitol?  Around 2:30 or 3:00?

15             MS. REED:  Our estimation is that he left some time

16   after 3:00 p.m.  So we don't believe that he was at the Capitol

17   when he tweeted "hold the line," which is even more, you know,

18   egregious in some instances because Mr. Straka states that at

19   that point he goes back to his hotel room.  I'm not exactly sure

20   when he decides to turn on the television and watch the news and

21   get the full scope of what's going on, but certainly, what he

22   saw in and of itself was sufficient for him to know that he

23   should not have tweeted out something like "hold the line."  And

24   then following that tweet, he continued to be supportive of the

25   conduct that happened on January 6.

1   So Your Honor, we have pointed out the fact that

2   Mr. Straka's tweets prior to, during, and after January 6 should

3   be considered by this Court as aggravating factors, in addition

4   to his conduct that he did on that day.

5   So Your Honor, I just go back to that statement to say that

6   the government does appreciate the fact that we have charged him

7   with a misdemeanor.  However, Mr. Straka's conduct on that day

8   was serious.  And we believe -- I'm sorry, Your Honor.

9   THE COURT:  No, go ahead.

10  MS. REED:  And we believe that a home confinement

11  sentence with probation is something that is important not only

12  because it reflects the seriousness of the offense, but also

13  because it does point to general deterrence, as well as specific

14  deterrence.  Much has been made by defense counsel of the fact

15  that they believe very erroneously that the government is

16  attempting to criminalize or penalize Mr. Straka simply because

17  he was exercising his First Amendment rights.

18  That simply is not the case here.  Mr. Straka's words were

19  specifically tied to his actions on that day.  That illicit

20  conduct was what happened here, but that is something that the

21  Court can consider, his words and his actions, for sentencing

22  purposes.

23  And so Your Honor, again, I know this case is a lot larger

24  than that one statement in the PSR, but I did think that was a

25  good starting point for this Court to be able to appreciate the

fact that the government does see this as a very serious case, never mind the fact that Mr. Straka did not enter, and we would hope that he would do the same.  And I would like to believe that perhaps he does now have a full appreciation of his conduct on that day, being that he has taken steps since his conduct on January 6 to try to right that wrong.

He has, obviously, accepted responsibility early in this case, which we have noted as a mitigating factor.  He has been interviewed by the FBI and has given full allocution of his conduct on that day.  We do find that to be significant as well. We do also find a number of the other factors, such as the fact that he has made an effort to give back, if you will, to the community by assisting police officers in fundraising for police officers.

So I don't want to minimize the fact that he has made efforts to mitigate his conduct on that day, but certainly, Your Honor, we think the fact that Mr. Straka's conduct on that day was egregious, we believe that there is the possibility that he could in the future continue to use his platform to further incite and encourage violence should a situation like this happen in the future.  We do believe that a term of probation is justified in this case because of that.

And so, Your Honor, that supports the government's request for a period of four months of home detention followed by probation in this case, in addition to other consequences that

1    the Court may impose.

2              THE COURT:  Ms. Reed, a couple of questions.

3              MS. REED:  Yes, Your Honor.

4              THE COURT:  Regarding the debriefings you mentioned,

5    is it the government's position that Mr. Straka was truthful,

6    complete, and helpful?

7              MS. REED:  Yes, Your Honor.

8              THE COURT:  All right.  And the government's position,

9    I understand it, in these January 6 misdemeanor cases is to not

10   file 5K1.1 motions; is that right?

11             MS. REED:  That is correct, Your Honor.

12             THE COURT:  Okay.  Given his resources, I don't

13   understand why the government is not recommending that the Court

14   impose a fine in this case.

15             MS. REED:  Well, Your Honor, the government has not

16   made that recommendation in this case, and certainly in other

17   cases, we have not as well.  However, we do understand that it

18   is the discretion of this Court that if the Court finds it

19   appropriate to do so, that a fine can be instituted.

20        Certainly, Your Honor, we do -- we have noted the

21   information that is in the PSR.  So we do believe that

22   Mr. Straka does have the financial means to pay a fine if this

23   Court were to impose a fine.

24        So while we have not requested that, Your Honor, we

25   certainly understand that is in the Court's discretion to impose

1    a fine.

2              THE COURT:  To the extent you have any views on the

3    proposed conditions if the Court were to follow your

4    recommendation, what is your view on the recommended conditions

5    that Probation has suggested?

6              MS. REED:  Your Honor, we stand with Probation in the

7    recommendations that have been requested.

8              THE COURT:  Including the computer monitoring and

9    search conditions?

10             MS. REED:  Yes, Your Honor, and we believe that that

11   is particularly important in this instance because of

12   Mr. Straka's role as a social media influencer.  Obviously, he

13   uses that platform in the manner that he does, to speak freely,

14   which again he has the right to do so, of his political beliefs.

15   But obviously, in this case we believe that he exaggerated the

16   confines of that by inciting and encouraging violence.  So we do

17   believe that it would be appropriate to have that monitoring.

18             THE COURT:  Ms. Reed, looking at some of the other

19   cases in which judges have imposed this condition in connection

20   with the January 6 cases, comparing what Mr. Straka posted on

21   his platform with what was posted in those cases, it does seem

22   that his posts are not specifically advocating violence in the

23   same way.  I mean, some of the comments that were made in other

24   cases were very direct in advocating violence, and I'm just

25   concerned about the line and where that should be drawn.  It

1    seems like in those cases there were real specific comments

2    about engaging in violence.

3          MS. REED:  And so that is correct, Your Honor, but the

4    one thing that I would like the Court to consider is the

5    evidence that was submitted in Government Exhibit E.  It's on

6    page 11 of the government's sentencing memorandum, and I can

7    read it for you.

8        So Your Honor, after Mr. Straka left the Capitol on

9    January 6, he posted a number of tweets.  One of those tweets

10   states, "I'm completely confused.  For six to eight weeks,

11   everybody on the right has been saying 1776 and that if Congress

12   moves forward it will mean a revolution.  So Congress moves

13   forward.  Patriots storm the Capitol.  And now everybody is

14   virtual signaling their embarrassment that this happened."

15       So Your Honor, I point specifically to this communication,

16   because if you go back, the six to eight weeks that Mr. Straka

17   is talking about falls directly in line with some of his tweets

18   beginning on December 20 -- I'm sorry, December 2 where he

19   starts communicating, I believe and the government believes,

20   what is going to happen on January 6.

21       So I understand that he does not expressly, as in some of

22   those other cases, advocate for violence, but we certainly

23   believe that it is implicit in his communications about what is

24   going to happen.  And we specifically point to this time frame

25   because that seems to go back to the communications that he

starts on December 20 -- I'm sorry, I don't know why I keep say
December 20, December 2 in which he does, we believe, imply that
there is the possibility for violence.  But we do understand
that it's not as express as some of those other cases.

THE COURT:  Anything else you would like to say,
Ms. Reed?

MS. REED:  Not at this time, Your Honor.

MR. ESSAYLI:  Thank you, Your Honor.  I would like to
respond to the comments the government just made, as well as
address our points.

THE COURT:  Can you start first with this condition,
if the Court were to impose probation, your view on the computer
monitoring conditions.

MR. ESSAYLI:  We do not believe computer monitoring is
appropriate, Your Honor.  A computer was not used to commit the
offense here.  We strongly disagree with and dispute the
government's characterizations of his use of his social media
accounts before, during, and after the event.  So there's no --
in our viewpoint, there's no correlation or connection between
the offense conduct and the proposed conditions on there.

Your Honor, we also don't believe drug testing terms is
appropriate.  This is not a drug offense.  There is no issue
here with him using drugs.

Those are the two conditions I wanted to address, Your
Honor.

1          THE COURT:  I did not see the drug -- oh, that's a

2     standard condition.  You mean the submitting to a drug test

3     within 15 days of placement on supervision and at least two

4     periodic drug tests?

5          MR. ESSAYLI:  Yes, Your Honor.  And if it's standard,

6     that's fine --

7          THE COURT:  Those are mandatory conditions that are

8     imposed in these cases.  There's not a separate suggested drug

9     treatment or testing condition specifically proposed by

10    Probation in this case.  That's just a mandatory condition

11    that's included in all of these cases.

12         MR. ESSAYLI:  Well, in that case, Your Honor, our

13    objection is to the computer monitoring and search conditions.

14    We just do not think there's a nexus between that and what he

15    has actually been charged with and pled to in this case.

16         THE COURT:  You have no objection to the remainder

17    other than that and the computer monitoring provision?

18         MR. ESSAYLI:  Correct, Your Honor.

19         THE COURT:  Go ahead, Mr. Essayli.

20         MR. ESSAYLI:  Yes, Your Honor.

21       It's important to start, Your Honor, and note that we have

22    never tried to argue that this was not a significant offense,

23    Your Honor.  Mr. Straka understands the magnitude of the

24    offense.  He does appreciate the seriousness, and he accepts

25    full responsibility for his conduct.

1    However, this does not mean the government can have it both

2    ways in this case, Your Honor.  They cannot plead him out to a

3    simple petty offense misdemeanor for disorderly conduct and then

4    try to bootstrap and bring in really inflammatory allegations of

5    inciting violence and suggesting that he is somehow responsible

6    for the overall violence that occurred that day against the

7    Capitol police officers.  That is just not appropriate, and it's

8    not accurate in our viewpoint.

9    And I think it's really dangerous to have the government

10   going down in what we view is the criminalization of political

11   activities.  If you look at his tweets or comments prior to

12   January 6, that is all protected political speech.  The

13   government makes no comments about the First Amendment.  It

14   makes no analysis of *Brandenburg*.  The Supreme Court has

15   painstakingly explained that the First Amendment is highly

16   protective of political speech.  Even speech that the government

17   may find offensive or the government may find that goes up to

18   the line, it's protected.

19   In order for it to be punishable by the government, it must

20   be both specific as to articulate acts of violence, and it must

21   be imminent.  You need both components in order to punish the

22   speech.  We do not believe any of the comments the government

23   has cited or attributed to Mr. Straka fall into the category of

24   either specific or imminent.  And as the Court pointed out,

25   there are no calls out for violence.

1   And I think it's really dangerous and scary when the

2   government says things like, well, it's implied.  Who decides

3   it's implied?  That's the viewpoint of the reader or the

4   listener.  And you cannot punish the speaker based on the

5   viewpoint of the listener.  You must look at his intent and his

6   conduct.

7   And Your Honor, this was not premeditated.  He did not --

8   Mr. Straka did not show up on January 6 expecting to be caught

9   up in anything like this or intending to commit any acts of

10  violence.  He was there, yes, to engage in a very, you know,

11  vocal, forceful protest.  That's a part of America.  That's what

12  we do.  They were there specifically to support the objection to

13  the Electoral College vote.  This is not something that's rogue.

14  It's not something that's illegal or unconstitutional.

15           THE COURT:  Mr. Essayli, correct me if I'm wrong, but

16  didn't Mr. Straka know -- when he was on his way on the Metro,

17  didn't he know that the Capitol had been breached?

18           MR. ESSAYLI:  It wasn't clear to me, Your Honor,

19  specifically when he learned the Capitol was breached.

20           THE COURT:  I thought he said in his statement to me

21  that he got word that the Capitol had been breached.  I read

22  that somewhere, and I think it was in his statement.

23           MR. ESSAYLI:  Yes, Your Honor, that is correct.  I

24  just don't know when he specifically learned that.  I think it

25  was right when he got off the Metro or before.  But he did learn

1   it was breached.

2        Now, this is what I want to say about that, Your Honor,

3   because I do think we have to put this into perspective.

4   Obviously --

5            THE COURT:  So let me read what he said.  "On the way

6   to the Capitol, I began getting text messages from people I knew

7   who were at home watching the news on television indicating that

8   people were going inside the Capitol building."

9        I have to say, I just don't find it credible, despite the

10  fact that Mr. Straka approached from the east side, that he had

11  no idea about what was going on in and around other parts of the

12  Capitol.  That just doesn't ring true, given his contact with

13  people and his -- you know, the fact that realtime he didn't

14  have a better sense, an hour and a half after the Capitol had

15  been breached, what was going on.

16       That does not ring true, particularly when he says that he

17  left the Capitol and didn't realize what had happened until he

18  watched the news from his hotel room.  And then as the

19  government's pointed out here, he's sending, you know, tweets at

20  5:30 p.m., "Patriots at the Capitol, hold the line," and he

21  wants to go on a news show that night and say the same thing,

22  and they won't take him.  And the next day, he says in response

23  to that how disappointed he was and how frustrated he was by

24  those who went on TV that night and said that this was an

25  embarrassment and shameful.

1      So given all of that, it's very hard to accept what
2  Mr. Straka wants me to believe about what he knew and about his
3  view of what was happening at the Capitol.
4      MR. ESSAYLI:  Your Honor, I would like to address
5  that.  And the way I want to start with that, Your Honor, is to
6  put this in perspective.  When we on TV -- when we saw what
7  happened on TV, listening and hearing the Capitol's been
8  breached or we're going in the Capitol is very different than
9  what was actually happening on there, with the confrontations
10 with police, the breaking and smashing of windows, the fights
11 that were occurring out there, people scaling walls.
12     THE COURT:  Let me share another comment he made in
13 the statement to the Court.  He said he was receiving text
14 messages from people watching news footage of January 6 at home
15 that sounded unlike anything he had ever seen at a right wing
16 rally before.
17     MR. ESSAYLI:  Anything, yes.  I think, Your Honor,
18 what Mr. Straka -- what happened is he got caught up in the
19 moment.  He believed this was a moment where the protesters were
20 being heard, they were going to go inside the Capitol.  At no
21 point did he know that there was actual violence being committed
22 or occurring at that point, and that's not --
23     THE COURT:  How can you say that when he watched a
24 police officer's shield be taken away from him and chimed
25 in "take it, take it"?

1          MR. ESSAYLI:  Your Honor, our viewpoint on that, and

2    the Court has the video --

3          THE COURT:  I've watched it; I've watched it.  That

4    shield was really close to him.

5          MR. ESSAYLI:  Yes, Your Honor.  Our viewpoint is he

6    was in the back of the crowd.  He was filming it; he was

7    documenting it.  He does understand that that was really

8    abhorrent conduct.  He did tweet, you know, after the event that

9    he denounces any form of violence, that's not who this movement

10   is.  And that was before he was arrested.  It's not --

11         THE COURT:  And that didn't come for several days, did

12   it not?

13         MR. ESSAYLI:  I think once he appreciated the

14   magnitude of what happened, Your Honor, and understanding that

15   this was not appropriate, he did express remorse before he was

16   charged.

17         THE COURT:  Why didn't he appreciate the magnitude of

18   what happened when he watched the news clips that night from his

19   hotel room?

20         MR. ESSAYLI:  Because, Your Honor, I believe what's

21   happening is the media and the government was trying to lump all

22   the protestors into one category, and they wanted everyone

23   present there on January 6 to be characterized and attributed to

24   the violence that was occurring.

25         And I think what you heard from Mr. Straka was a pushback

1    to that.  There were a lot of people there who were not

2    committing violence, who were there for a legitimate reason, and

3    were caught up in something bigger.

4         And Your Honor, I'm not excusing his conduct; we do not

5    excuse his conduct.

6              THE COURT:  What does he mean by "patriots, hold the

7    line"?  What does he mean by that comment?  At that point he

8    thinks they're inside the Capitol, they've breached the Capitol.

9              MR. ESSAYLI:  No, Your Honor, he does not.

10             THE COURT:  He is not distinguishing between

11   nonviolent and violent patriots.  He's saying, "Patriots, hold

12   the line."  What did he mean by that?

13             MR. ESSAYLI:  Your Honor, what he meant by that is --

14   at that point he had left the Capitol.  He turned around and

15   said we're not going in.  And you saw that on the video.  He

16   turns around, and he sees the crowd that are staged in front of

17   the Capitol outside protesting, waiting --

18             THE COURT:  After the tear gas.

19             MR. ESSAYLI:  After the tear gas, yes, they were still

20   outside protesting.  His point of "hold the line" was stay in

21   your place, continue the message, continue your political

22   speech.  It was not --

23             THE COURT:  The next day in his video, he talked about

24   it being no big deal that people went inside the Capitol.  I

25   mean, he seemed to think that that was a valid way to contest

1    the election, even the day after.

2          MR. ESSAYLI:  Your Honor, he accepts responsibility,

3    and he does acknowledge that is not appropriate behavior, it is

4    wrong, they should not have gone in the Capitol.  We do not

5    dispute that.  Mr. Straka has acknowledged that, and I believe

6    he will acknowledge it again today.

7          And our request to Your Honor is that you punish him for

8    his conduct that day, including the conduct in entering the

9    restricted space and knowing -- after knowing it was breached.

10   We do not want the Court to punish him, though, for a lot of the

11   other stuff the government --

12         THE COURT:  I'm not going to punish him for his

13   statements.  He has a First Amendment right to say what he

14   wants, not to incite violence, but I hear your point about the

15   way in which that's interpreted by the Court.

16         But to be sure, his statements at the time and immediately

17   after the Capitol event do inform his actions on that day.

18         MR. ESSAYLI:  Yes, Your Honor.

19         THE COURT:  That's how I'm viewing his statements, in

20   assessing what he did that day.  And he wants me to believe that

21   he was there completely oblivious to anything else that was

22   going on around him and he was just, you know, a peaceful

23   protestor there and he wasn't encouraging anything else.

24         And it's very hard to draw that conclusion looking at the

25   video footage and particularly his comments at the time and

1    immediately thereafter.

2         MR. ESSAYLI:  Your Honor, the comments, I think, have

3    to be perceived in a political way.  He was taking a lot of heat

4    and was being attacked in the media, and what he wanted to

5    explain or rebut was that not everyone there was engaged in

6    violence, there was a legitimate purpose for being there, and he

7    did not want to delegitimize the cause that he was involved in.

8         Again, he has pled guilty to disorderly conduct.  He should

9    not have been on the Capitol ground.  He accepts responsibility.

10   And this was -- Your Honor, I think we can appreciate that in

11   our time in our country, people get very emotionally caught up

12   in politics on both sides.

13        And Mr. Straka got caught up that day and I do not think

14   fully appreciated his actions.  It probably took him a few days

15   to come to terms with and understand the full magnitude of what

16   occurred.

17        THE COURT:  Even in your filings, even in his

18   statements to Probation, there still seems to be an effort to

19   minimize what he did and what he was a part of that day.  And --

20        MR. ESSAYLI:  It's not -- I apologize.  I didn't mean

21   to interrupt.

22        It's not to minimize.  It's to rebut, I think, a very

23   extreme and strong narrative that's being advanced by the

24   government suggesting that this conduct was somehow

25   premeditated, that it was organized, that it was done in

concert, that it was something larger than what it was and that

Mr. Straka -- Your Honor, I was, frankly, a former prosecutor.

To read the line in the government papers saying but for

Mr. Straka's conduct the riot would not have been successful,

that's a very extreme statement, a but-for causation between

Mr. Straka's conduct and the riot, when there's so many other

factors that went into this, including the lack of appropriate

security on the Capitol --

THE COURT:  The defense emphasizing the level of

security and mistakes that had been made on that front are

completely irrelevant to what Mr. Straka did that day.

MR. ESSAYLI:  I agree they're relevant, Your Honor,

but they're relevant to the --

THE COURT:  Irrelevant.

MR. ESSAYLI:  I agree they're irrelevant to

Mr. Straka.  We only brought those arguments because of the but-

for argument the government made saying but for Mr. Straka's

conduct the riot would not have happened or would not have been

successful.

THE COURT:  Your papers also suggest that the

barricades were down and somehow he thought he was standing in

the right place.  And nonetheless, he got within, as he admits

the next day, 10 feet or so of the door where an alarm is

blaring and can be heard throughout the video and tear gas is

coming out, and somehow he still persists in thinking that what

he did was okay.  It took him a while to come around and say

that's not okay.

     And even now, he's distancing himself from the larger --

you know, the larger attack on the Capitol, which he condoned,

wanted to condone on national TV that night.  He wasn't allowed

to go on because the people filming the show didn't want someone

on there saying that.  But he wanted to do that, and he was

frustrated that others went on there that night and didn't say

what he wanted to say.

          MR. ESSAYLI:  Your Honor, he's never condoned

violence, and his intent wasn't to condone violence.  He was

trying to explain why he and the others were there.

     Your Honor, he accepts responsibility.  He should not have

been there.  We agree.  He does acknowledge that now.  It may

have taken him a day or two to fully appreciate it, but he has

appreciated it, Your Honor.

     And I just want to note, going back to the sentencing

factors here, Mr. Straka has no criminal history.  I think

objectively we can look at this and say that this conduct was an

aberration.  This is not something that Mr. Straka has ever

engaged in before and is not likely to ever engage in again.

     He has had no issues while on supervision with Pretrial

Services, and there was a report filed, I believe, on Friday

confirming that he has been, I guess, a star pupil when it comes

to supervision there.

1      And I do think that the disproportionate impact that
2  this -- that these charges have had on him should be considered
3  by the Court, Your Honor.  He's not a typical, you know, person.
4  He is more high profile, and he has suffered a lot of
5  consequences, not to say that some of them were not, you know,
6  justified.  But we're just saying that he is suffering
7  consequences far and above what other defendants in these
8  similar cases would be suffering.
9      And then also as far as sentencing disparity, Your Honor, I
10  know just last week Your Honor sentenced Mr. John Walden to 30
11  days' home confinement and three years' probation for parading
12  in the Capitol.  And we would argue that his conduct was
13  obviously more egregious, going into the Capitol, parading.  I
14  believe he scaled a wall, entered a broken window, and he
15  climbed in.
16      So what we're arguing here, Your Honor, is that, number 1,
17  Mr. Straka has already served two days in jail.  He was arrested
18  in the middle of a blizzard.  It took him two days to get to a
19  magistrate judge.  That was a very, I'll be honest with you,
20  traumatic experience for Mr. Straka.  He's never been in jail
21  before.  It gave him the opportunity to reflect and appreciate
22  even more the seriousness and magnitude of the matter.  So he
23  has already spent two days in jail.
24      And if the Court deems that he needs additional punishment,
25  we would -- we do suggest that a minimal period of home

confinement of 30 days would be appropriate or sufficient but
not greater than necessary.

But we don't think probation is needed here.  One, we think
it is a waste of resources.  Mr. Straka is never going to do
anything like this again.  He's already demonstrated over the
last year that he is not engaged in any kind of similar conduct
or behavior and will never engage in it again.  And I think
giving him probation on top of the maximum fine and the other
conditions would create a disparity here when you look at the
aggravating factors.

So for that reason, Your Honor, that's the reason we gave
the recommendation that we did.

THE COURT:  Since you've raised the Walden case, I
will respond to that.  I do view this case as more egregious
than that case even though that defendant went inside the
Capitol.  Based on the evidence I've seen and Mr. Straka's
comments on the video, at the time he was standing within feet
of the door, he said, "We're going in."  And he gets close to
the door, and he gets pushed back with the tear gas.  And at the
time someone comes out and says, "They've left.  Our job is
done."

So number 1, I'm not so sure he wouldn't have gone in if
the timing had been different.  And number 2, unlike the other
defendants I've sentenced, he was encouraging others.  He was
playing a very different role.  He wasn't just acting

unilaterally.  He was acting and encouraging and condoning and all of that in realtime that I saw on the video.

So that is an aggravating factor that sets him apart from the average January 6 defendant, even though I do acknowledge he didn't engage in any assaults and he didn't engage in any property damage.  But nonetheless, his case I view as an aggravated case.

MR. ESSAYLI:  And having the Court watch the video, you have had the benefit of seeing it yourself.  What I would argue on that, Your Honor, is that when you look at the video, you listen to the video more importantly, his comments are not yelled, they're not said in a way to encourage others.  To me, when I watch it --

THE COURT:  He's speaking into a video that he is then going to post --

MR. ESSAYLI:  It, Your Honor, was not live.  It wasn't being streamed.  He was documenting it.  And I do think this is important.  Yes, he posted the video after the event was concluded.  So that wouldn't have encouraged others to come and join in.  It was over at that point.  But more importantly, he took it down in less than 24 hours.

And I think that does show, Your Honor, some consciousness on his part that something wasn't right about this, this wasn't appropriate, and he voluntarily took that down on his own.  He wasn't forced to or told to.  He just stepped back and said, "I

```
 1    don't want to appear to be encouraging violence, and so I'm
 2    going to take this down."  And I do think the Court should
 3    consider that as a part of his accepting the magnitude of what
 4    happened and showing some remorse.
 5              THE COURT:  But I have to consider it in connection
 6    with the statements he made the day after when he did in that
 7    video as well condemn violence, but he still persists in this
 8    idea that it is okay to storm the Capitol to contest an
 9    election.  And that's not what we do in this country.
10              MR. ESSAYLI:  We agree with that, Your Honor.  That is
11    not what we do in this country.
12              THE COURT:  People who do that are not patriots, to
13    storm the U.S. Capitol.
14              MR. ESSAYLI:  But not everyone there entered the
15    restricted space, and not everyone entered the Capitol.
16              THE COURT:  He did.
17              MR. ESSAYLI:  He did, correct, but his comments aren't
18    directed at just those folks that were in the restricted space.
19    He was talking to a larger audience.
20              THE COURT:  There's nothing that he said on those
21    tapes that drew that line.  He talked about patriots generally.
22    He did say, "I don't condone violence."  He did say that.
23              MR. ESSAYLI:  He did say he did not condone violence.
24              THE COURT:  He did, but he also -- I think it's a fair
25    read of that video to come away with it believing that he's
```

telling his million-plus followers that it's okay to go into the Capitol to demand, as he put it, an audit.  He thinks that's okay, and he has a large following.  And he's --

MR. ESSAYLI:  He took it down, Your Honor; he took it down.  And the comments that were read by the government and cited in the papers were all made, I believe, on January 6.

THE COURT:  I watched the video.  Correct me if I'm wrong, anybody, but I think it's January 7, the day after.  It's a 55-minute video when he's back home.  He talked about being exhausted.  And he does draw the distinction between the violence and the rest.

MR. ESSAYLI:  Yes.

MS. REED:  That's correct, Your Honor.

THE COURT:  But he is persisting in this notion that it's okay to contest an election by going in the Capitol, by trespassing, and that's just not -- that's not consistent with the rule of law in our country.

MR. ESSAYLI:  We agree with that, Your Honor, and I believe Mr. Straka also agrees with that.  I do want to give him the opportunity to allocute directly to the Court.  He does have a statement he would like to make to you, Your Honor.

Again, I just want to emphasize, he does accept responsibility.  We do appreciate the seriousness of it.  And I do sincerely appreciate the Court saying that you are only going to sentence him based on his conduct and not for anything viewed

1    as protected political speech.  That's important to us.

2         So if it's appropriate now, I would invite Mr. Straka to

3    make -- or when the Court deems appropriate for him to make a

4    statement.

5              THE COURT:  All right.  Are you done, Mr. Essayli?

6              MR. ESSAYLI:  I believe I've covered -- I will just

7    confirm.  I think I've covered a lot of points, Your Honor.  And

8    I do appreciate the Court's questions.  You, obviously, know the

9    case well and the --

10             THE COURT:  The thing that's hard to understand, and

11   perhaps Mr. Straka is going to address this, but he started this

12   movement, the #WalkAway movement, which as I've read about it --

13   I wasn't familiar with it before reading all of the letters that

14   I received.  But the mission was to bring together people from

15   all walks of life to have civil discourse and to listen to one

16   another and to not be violent.  Again, his actions that day are

17   so inconsistent with that.

18             MR. ESSAYLI:  And that's why we think it's an

19   aberration, Your Honor, and I think Mr. Straka will address

20   that.  And I think that's one of the messages that he wants to

21   come across.  The 30-page memo by the government does not

22   reflect who he is as a person, his character, his life's work.

23        And people make mistakes, Your Honor, and they should not

24   have everything they've done be thrown away or everything good

25   they've done good be thrown away over -- this was a 15-minute

```
1    instance that I'm sure --

2              THE COURT:  It's more than 15 minutes.

3              MR. ESSAYLI:  The time that he --

4              THE COURT:  The comments leading up and the comments

5    afterwards suggest he was very much committed to this protest,

6    and maybe not the full extent of the violence and destruction

7    that was associated with it, but nonetheless, he seemed to buy

8    into this notion that it's okay to storm the Capitol.

9              MR. ESSAYLI:  The storm the Capitol thing, Your Honor,

10   didn't come up until January 6.  No one discussed and he didn't

11   discuss storming the Capitol.  Everything leading up to

12   January 6 was in the mind-set and intention of a peaceful

13   protest, and that's why I think he got caught up in that.

14        But I don't think any of his comments prior to January 6

15   could be viewed as encouraging or planning to storm the Capitol.

16   I don't think that's accurate, Your Honor.

17             THE COURT:  Anything further, Mr. Essayli?

18             MR. ESSAYLI:  Not at this time, Your Honor.

19             THE COURT:  Mr. Straka, I've read your statement to

20   the Court.  This is your time to make any additional statement,

21   if you choose to do so.

22             THE DEFENDANT:  Yes, Your Honor.

23        I prepared a written statement just because -- I normally

24   like to kind of speak from the heart and off the cuff, but

25   there's just so many details and so many things to this case
```

that I wanted to make sure that I kept my thoughts as straight as possible.

And to be honest with you, given some of the things I've heard in this hearing today, I don't -- I'm just going to stick with what I wrote.  I hope that you will hear where I'm coming from with an open mind and an open heart.

And what I have to say is that I'm holding here a 30-page document from the prosecution which tells the story of a person who couldn't be more dissimilar than who I am.  The person described in the document is reckless, thoughtless, dangerous, flagrantly irresponsible, and apparently proud and celebratory of all these traits.

This document suggests that this person is significantly responsible for the actions of others on January 6, including those who engaged in unacceptable acts of violence, vandalism, theft, and destruction which took place outside of my view and occurring at times when I wasn't even on Capitol grounds.

I don't know this person, and I don't identify with his purported thoughts, motivations, or the narrative presented about his character.

It would be impossible to tell you exactly who I am in a matter of minutes, but here are a few things I would like you to know.

I grew up in a small town in rural Nebraska, born into a family of generations of farmers and ranchers.  And truth be

told, I mostly hated the work when I was growing up, but I learned at a young age that if I put my mind, heart, and drive into working as hard as I could at something I really wanted, nothing in the world could hold me back, not even lack of financial privilege or opportunity.

Throughout my 20s and 30s, I developed a problem with cocaine and alcohol.  Tragically, this type of problem is not unusual for many of us in the LGBT community.  Many LGBT people turn to self-medication in response to lack of love and understanding and societal mistreatment.

My dream in life was to make a living as a performer.  I sing and act and spent many years of my adult life doing theater, usually musicals, and a small amount of work in film and television.

I started to see that my life had become a black hole of emptiness caused by more poor choices to keep returning to self-soothing through intoxication.  On January 18, 2015, I made a choice entirely of my own volition to join a 12-step program and get clean and sober.  That was the day I took my last drink, and I have been 100 percent clean from drugs and alcohol ever since.  Six days ago marked seven years of sobriety for me.

One of the most devastating aspects of my case has been the assertion that I was encouraging violence against police and that I was encouraging violence with my followers.

Your Honor, my followers don't condone violence, and all of

them stand up to back the blue in this country.  They would

never support me if my message was one of violence.  I want to

say here and now that I back America's law enforcement officers,

and I always have, and I always will.

Every year during the holidays, one of my organizations,

the #WalkAway Foundation, engages in a community-building

initiative to encourage goodwill and bring people together to

give in a way that makes the world a better place.

To be honest, I chose this year's holiday initiative in a

way to make a point.  I created an initiative called "REfund the

Police," raising funds in the month of December that would go as

charitable contributions to police departments in this country

that were defunded during the past year's political antipolice

movement.  I raised nearly $30,000 for this drive.  If I had not

been in a position to be unable to speak publicly and do media

appearances about this initiative, that number would have easily

been $100,000.  This was the amount I was able to raise by

sending e-mails and putting out a scattering of posts on a few

social media sites.

The point is, my followers would never tolerate me

advocating violence.  It's not who they are, and it's not who I

am, which is why they love our movement.  My followers are the

type of people who give their hard-earned money in the midst of

a pandemic and economic uncertainty to an initiative that seeks

to put equipment and resources back into the hands of America's

1    law enforcement.

2        My relationship with my fans and followers is not just
3    about politics.  It's about love.  That was echoed in every
4    character letter I received on my behalf.  I didn't get to hear
5    or read many positive things about myself for an entire year,
6    which took an enormous toll on my mental, spiritual, and
7    emotional health.

8        The sense of pride I had developed from the truly positive
9    and uplifting work I had done to help unite this divided country
10   and bringing people together has been shrouded by the relentless
11   cruel narratives about my character and my intention.  Some will
12   say hey, that's politics, this is what you signed up for.  But I
13   say no, it does not have to be this way.  We Americans can do
14   better than this.

15       I received around 500 character letters from my supporters,
16   many of them handwritten.  And in reading these letters, I got
17   to learn really for the first time how I'm seen by those who
18   appreciate and respect me.  And the thing that struck me the
19   most was that nearly every person talked about how what drew
20   them to me and my movement was it was the only one that focuses
21   on love.

22       Your Honor, the costs of my choice to go to Washington,
23   D.C., on January 6 are monumentally devastating, are so
24   monumentally devastating that I couldn't even begin to tell you
25   what this past year of my life has been like.  Life-long

friendships and family relationships are gone forever.  My work
has had to come to an absolute standstill.  And undoubtedly,
there are many opportunities that will be lost to me forever.

But now is the time for me to remember that throughout
everything I've remained sober, and I'm still the same guy who
took my broken life and turned things around.

I would like to conclude my statement today by once again
stating what I said in my written statement to you.  I am
sincerely sorry to all of the people of America, even the ones
who absolutely hate my guts and hated me long before January 6.
I'm sorry that I was present in any way at an event that led
anybody to feel afraid, that caused shame and embarrassment on
our country, and that served absolutely no purpose other than to
further tear away at the already heart-breaking divide in this
country.

I want to apologize to all members of the Capitol Police
whose safety was put in danger by the unruly mob, in particular
the police officer whose shield can be seen in my video being
grabbed by members of the crowd.  No protest should ever get out
of hand to the point of becoming a riot, and no police officer
should ever have to feel that their life or their safety is in
jeopardy while trying to keep the peace at a public
demonstration.

And I want to apologize to every member of Congress,
regardless of political affiliation or background.  I'm deeply

1    sorry and shameful for being present at an event that sent

2    members of Congress running in fear to evacuate a building.  I

3    can sincerely say I would never intend for such a thing to

4    happen, but nonetheless, it did, and I was there, and I am truly

5    sorry for that.  It is my intention to do better and be better

6    going forward in my life.

7         Thank you, Your Honor.

8         THE COURT:  Thank you, Mr. Straka, for your comments.

9    I appreciate them.  You talk about in your statement to me

10   finding the win in every situation, and I hope that you have

11   learned a lesson from this experience and that in the future you

12   will go back to the work of using your social media presence in

13   a positive way to unify the country.

14        Is there any reason why I should not proceed now to give my

15   reasons for the sentence and to impose sentence?  Mr. Essayli?

16        MR. ESSAYLI:  No, Your Honor.

17        THE COURT:  Ms. Reed?

18        MS. REED:  No, Your Honor.

19        THE COURT:  In deciding, as I've stated, what the

20   appropriate sentence is in this case, I have considered all of

21   the factors under Title 18 United States Code Section 3553(a).

22   I'm familiar with them all, even if I don't state each one of

23   them here.  I have considered each of them.

24        I do agree with the defense that Mr. Straka played a unique

25   role on January 6 of 2021.  He did not himself personally

1    assault any police officers, and he did not cause any property

2    damage.  He also did not enter the U.S. Capitol.

3        Even so, he clearly violated the law.  As he admitted at

4    the time of his plea, he knowingly and unlawfully entered the

5    restricted grounds of the U.S. Capitol, and he engaged in

6    disruptive conduct by encouraging others to enter the Capitol

7    and to take a Capitol police officer's shield who was trying to

8    defend the Capitol.

9        Mr. Straka knew at the time he entered the Capitol grounds

10   that he did not have permission to do so, and he did so, and he

11   engaged in disruptive conduct all with the intent to impede

12   Congress from certifying the electoral vote count for the 2020

13   presidential election.

14       Though Mr. Straka has since condemned the violence and

15   property damage that occurred on January 6, as I've explained

16   and discussed here, his statements on and around that day reveal

17   that he viewed his actions and those of the larger crowd as

18   appropriate and justified.

19       I want to be very clear about what I'm saying here about

20   Mr. Straka's comments.  He, as well as others who were at the

21   U.S. Capitol on January 6, have a First Amendment right to say

22   and to think whatever they believe.  Mr. Straka also has a First

23   Amendment right to share his views with others.

24       But trespassing on restricted grounds is not covered by the

25   First Amendment, nor is engaging in disruptive conduct by

encouraging others to enter the Capitol or to take a shield from a police officer.  None of the criminal conduct to which Mr. Straka has admitted is protected by the First Amendment, and that is why he is before the Court today.  He is not being prosecuted or sentenced based on his political views or his personal beliefs.

I find it deeply troubling that Mr. Straka used his social media platform to encourage and defend the unlawful acts that occurred on January 6.  Mr. Straka says his #WalkAway platform has over a million followers.  He also represents that he started the #WalkAway movement to bring people together for respectful dialogue in a peaceful way.

But his actions on January 6 were anything but.  They did not further the stated mission of his organization.  Instead, they served to undermine democracy and the rule of law. Election challenges are fought in the courts, not by storming the Capitol.

Turning next to Mr. Straka's history and characteristics, he has no prior criminal record, and he's been steadily employed throughout his life.  The Court has received numerous letters from Mr. Straka's family, friends, and followers.  As these letters attest, Mr. Straka has a large number of committed supporters from all different backgrounds.  They suggest that he's shown a high level of compassion and concern for his community, for his friends and his family.  These letters also

say that he has inspired a large number of people across the country to bridge the political divide in our country.  His followers admire him for the national movement he has led to bring people together in a peaceful way.

Mr. Straka has also engaged in good work following his arrest in this case.  He started an initiative to support police organizations, and he claims to have raised nearly $18,000 in support of law enforcement.

I'm crediting those efforts.  I'm also crediting that Mr. Straka pled guilty early in this case.  He also provided law enforcement agents with passwords to his electronics that were seized, and he agreed to be debriefed by law enforcement agents on three occasions.

The government has represented that he has provided full, truthful, and complete information that has been helpful to the government.  Again, under Section 3553(a), I am taking his efforts into account in deciding what sentence to impose.

Mr. Straka also has expressed remorse, though it has been slow in coming.  I also appreciate that Mr. Straka has faced a number of collateral consequences as a result of his prosecution that other January 6 defendants have not.  But these consequences are, in large part, due to his public profile and his widespread media presence.

I also note that through Mr. Straka's openness about his own personal struggles he has inspired others who have faced

similar struggles.  A number of years ago, he had an issue with drug and alcohol abuse, but he has overcome these challenges, and he has been supportive of others who try to do the same.

Looking at other January 6 cases, I recognize that this case is different than most others.  As I've noted, Mr. Straka did not engage in violence or property damage.  He did not enter the Capitol building.  Nonetheless, he did join rioters after he learned about the Capitol breach, and once he arrived, he not only trespassed on restricted grounds, he also engaged in disruptive conduct, as I've said, by encouraging others to enter the Capitol and by encouraging others to take a shield from a police officer who was defending the Capitol.

He videoed these events.  He posted this footage online for his followers to see.  And he later encouraged rioters who remained at the Capitol to hold the line.  And that was even after he left the Capitol that day.

As I've explained, his statements and his actions in and around January 6 suggest that he not only participated in the events of that day, he also defended and celebrated them to a degree.

The government has permitted Mr. Straka to plead guilty to a Class B misdemeanor.  That offense has a maximum period of incarceration of six months.  Though I do view Mr. Straka's criminal conduct as very serious, as I've noted, it's been mitigated somewhat by his early plea and by his willingness to

assist the government by providing complete and truthful information.  And this is one reason why I do not believe that a period of incarceration is necessary to achieve the purposes of sentencing.

As I've explained previously in an earlier January 6 case, I do not believe that in sentencing a Class B misdemeanor offense that the Court has the statutory authority to impose both a period of imprisonment and a term of supervision, either supervised release or probation.  And therefore, in cases like the present one where deterrence is so important, particularly specific deterrence, I have imposed a period of probation for three years.

For that period of time, defendants are under the continued supervision of the Court.  Whereas, with a short period of imprisonment, the defendant would complete his or her sentence once the term of imprisonment is served.  The longer period of supervision serves to ensure that defendants and others have an incentive not to violate the law during the term of supervision.

I believe here that a three-year period of probation coupled with a three-month period of home detention, a community service requirement, and a fine is sufficient but not greater than necessary to achieve the purposes of sentencing.

In addition to achieving both specific and general deterrence, I believe this sentence will also promote respect for the law, ensure adequate punishment, as well as

1    rehabilitation.

2         I will impose the maximum fine available, which is $5,000,

3    because I believe based on the financial information provided by

4    the Probation Office that Mr. Straka has adequate means to pay

5    both a fine and the $500 restitution payment.  I will also

6    impose a financial monitoring condition while these payments are

7    outstanding.

8         I will not impose electronic monitoring -- computer

9    monitoring condition because I do believe that the nature of

10   what Mr. Straka posted online is distinguishable in content from

11   those cases where defendants have expressly advocated specific

12   acts of violence.

13        I will impose a mental health condition.

14        And I will now read the formal sentence of the Court and

15   give both parties and Probation the opportunity to object before

16   I impose sentence.

17        Pursuant to the Sentencing Reform Act of 1984 and in

18   consideration of the provisions of Title 18 United States Code

19   Section 3553(a), it is the judgment of the Court that you,

20   Brandon Straka, are hereby sentenced to a term of 36 months'

21   probation as to Count 1.  In addition, you are ordered to pay a

22   special assessment of $10.

23        While on supervision, you shall abide by the following

24   mandatory conditions, as well as the standard conditions of

25   supervision.  The mandatory conditions include not committing

1   another federal, state, or local crime, not unlawfully

2   possessing a control substance, refraining from any unlawful use

3   of a controlled substance, submitting to one drug test within 15

4   days of placement on supervision, and at least two periodic drug

5   tests thereafter as determined by Probation.

6       You must make restitution.  You are ordered to make

7   restitution to the Architect of the Capitol in the amount of

8   $500.

9       The Court will authorize supervision of this case to be

10  transferred to the United States District Court for the Middle

11  District of Nebraska, but the Court will retain jurisdiction of

12  this case.

13      In addition, Mr. Straka, you shall comply with the

14  following special conditions.  You must pay the balance of any

15  restitution owed at a rate of no less than $100 each month.  You

16  must provide the probation officer access to any requested

17  financial information and authorize the release of any financial

18  information.  The Probation Office may share that information

19  with the U.S. Attorney's Office.

20      You must also participate in a mental health treatment

21  program and follow the rules and regulations of that program.

22      You will be monitored by a form of location monitoring

23  technology for a period of 90 days, or three months.  You must

24  follow the rules and regulations of the program.  Location

25  monitoring technology will be at the discretion of the probation

1   officer.  You must also pay for the cost of the program.  You

2   will be restricted to your residence at all times except for

3   employment; education; religious services; medical, substance

4   abuse, or mental health treatment; attorney visits; court

5   appearances; court-ordered obligations; or other activities as

6   approved by the probation officer.

7         So this is a form, to be clear, of home detention.

8         You are also ordered to pay a fine in the amount of $5,000.

9   Restitution payments shall be made to the Clerk of Court for the

10  United States District Court and, as I've stated, in the amount

11  of $500 to the Architect of the Capitol.  The financial

12  obligations are immediately payable to the Clerk of Court.

13  Within 30 days of any change of address, you shall notify the

14  Clerk of Court of the change until such time as the financial

15  obligation is paid in full.

16        The Probation Office shall release the presentence

17  investigation report to all agencies, and those agencies shall

18  return the report.

19        All right.  Is there any objection -- I will inform

20  Mr. Straka of his right to appeal, but before I do so,

21  Mr. Essayli, is there any objection to the sentence that the

22  Court has yet to impose?

23             MR. ESSAYLI:  Your Honor, is the financial disclosure

24  term a standard --

25             THE COURT:  These are standard whenever fines or

1    restitution is included.

2              MR. ESSAYLI:  Okay.  Because Mr. Straka, obviously,

3    can pay the fine.  I don't know that there's a need to provide

4    ongoing financial information.

5              THE COURT:  I am going to include it for now, and that

6    can be modified in the future if there's no need to continue to

7    have it.

8              MR. ESSAYLI:  Thank you, Your Honor.  That's the only

9    thing.

10             THE COURT:  Anything else, Mr. Essayli?

11             MR. ESSAYLI:  No, Your Honor.

12             THE COURT:  Ms. Reed?

13             MS. REED:  No objection, Your Honor.

14             THE COURT:  Ms. Reichler?

15             PROBATION OFFICER:  Nothing at this time, Your Honor.

16   I just ask that Mr. Straka stay on the line after so I can relay

17   the conditions and give him pertinent instructions.

18             THE COURT:  That is the sentence of the Court.  What

19   I've just mentioned is imposed.

20        Mr. Straka, you do have the right to appeal your conviction

21   and your sentence except to whatever extent you may have validly

22   waived that right as a part of your plea agreement.  If you do

23   choose to appeal, the notice of appeal must be filed within 14

24   days of the judgment of conviction.

25        Is there a need to dismiss any other counts, Ms. Reed?

1          MS. REED:  There is, Your Honor.  Specifically,

2     Mr. Straka was initially charged by information and has

3     subsequently pled to a superseding information.  So at this

4     time, Your Honor, the government would respectfully request to

5     dismiss the information.

6          THE COURT:  All right.  The motion is granted.

7          MS. REED:  Thank you.

8          THE COURT:  Anything else from the government or the

9     defense?

10          MS. REED:  Nothing from the government, Your Honor.

11          MR. ESSAYLI:  No, Your Honor.  Thank you.

12          THE COURT:  All right.  Thank you all.

13        (Proceedings adjourned at 12:18 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a
correct transcript from the record of proceedings in the
above-entitled matter.


        Please Note:  This hearing occurred during the
COVID-19 pandemic and is, therefore, subject to the
technological limitations of court reporting remotely.



/s/ Sara A. Wick                    February 23, 2022
SIGNATURE OF COURT REPORTER         DATE