## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **:** |
| | **:** |
| **v.** | **:** |
| | **:**      **Case No. 21-cr-579 (DLF)** |
| **BRANDON STRAKA** | **:** |
| | **:** |
| **Defendant.** | **:** |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO STRAKA'S MOTION FOR EARLY TERMINATION OF PROBATION PURSUANT TO 18 U.S.C. § 3564(c)

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to Brandon Straka's ("Straka") Motion for Early Termination of Probation Pursuant to 18 U.S.C. § 3564(c). ECF No. 63.

On January 6, 2021, while members of Congress gathered in the United States Capitol to certify the results of the 2020 presidential election, Straka joined a mob outside of the Capitol, encouraged protestors to unlawfully enter the Capitol, and verbally chanted in favor of rioters removing a protective shield from an officer. *See* Government's Sentencing Memorandum, ECF No. 36.  For this conduct, Straka pled guilty to one count of Disorderly Conduct in the Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D). On January 24, 2022, Straka was sentenced to 36 months of probation, and three months of home detention. *See* Judgments, ECF Nos. 48, 50. Now, halfway through his term of probation, Straka asks this Court to terminate his probation early.

On August 9, 2023, Straka filed his Motion for Early Termination of Probation. ECF No. 63. Straka contends that his probation should be terminated because he has satisfied the conditions of his probation by serving his period of home detention, completing his required community service, attending his required mental health counseling sessions, and satisfying his monetary

obligations. U.S. Probation, according to Straka, does not object to his request.   For the reasons stated herein, the Court should deny this motion.

I.      **<u>FACTUAL BACKGROUND</u>**

Following the November 2020 Presidential election, Straka used his popular social media following to espouse his political position. Straka frequently told his "Patriots" that it was time to "rise up" as part of a "civil war."   Many of Straka's messages contained rhetorical flourishes that are common in political speech.   In early December 2020, Straka sent out messages informing his followers that they "could not allow" a presidential transition and encouraging his followers to prepare for a civil war.   *See* Gov. Figure A and Figure B.



> **Brandon Straka** ✔
> @BrandonStraka
>
> We can not allow a transition to Biden under these circumstances. This is not ok. 74M+ Americans know that something is horribly wrong and feel victimized by the politicians and the media orchestrating this scam.
>
> If we don't get a thorough audit we must not allow a transfer.
>
> 9:19 PM · 12/1/20 · Twitter for iPhone

Gov. Figure A



Part of what paralyzes ppl when it's crucial to act & essential to fight is uncertainty & unpreparedness.

Make peace right now w the fact that we are in a civil war. We didn't want it & didn't start it. But it's here. They're counting on your silence & compliance to win.
Don't.

9:48 AM · 12/2/20 · Twitter for iPhone

Gov. Figure B

Then, on December 19, 2020, Straka shared a video of and quoted an individual who stated that it was his intention not to be "peaceful for much longer."   Gov. Figure C; original video available at  https://twitter.com/speakupmoveout/status/1340274672768827394  (last viewed January 13, 2021).   Straka's post, which was viewed more than 100,000 times, included a message that it was time to "rise up!" *Id*.



Gov. Figure C

It was in this context that Straka traveled to Washington D.C. on January 4, 2021, from where he had been working on the special election in Atlanta, Georgia to attend several "Stop the Steal" events where he would be a featured speaker. *See* ECF 28 at ¶ 17.   One of the more prominent of these was a large rally on January 5, 2021 at Freedom Plaza in Northwest, DC.   *LIVE NOW: Crowds have gathered for the "Stop the Steal rally in Washington, DC.*   WPTV NewsChannel 5 (available at https://www.facebook.com/WPTV5/videos/live-stop-the-steal-rally-in-washington-dc/209369994185413/).   During his five-minute long speech, Straka again used common rhetorical flourishes, referring to the rally attendees as "patriots," and referenced a "revolution" multiple times. *Id. at 32:27-37:18*   Straka directed the attendees to "fight back." *Id.*

The next day, January 6, 2021, Straka attended the "Rally to Save America" on the White House Ellipse and then planned to travel to an area near the U.S. Capitol Building where he was going to give another speech.   *See* ECF 1, p. 2 at ¶ 3   Straka used the Metro to travel to the U.S. Capitol. *Id.*   While traveling to the U.S. Capitol, he received alerts on his telephone stating that

former Vice President Mike Pence was "not going to object to certifying Joe Biden." *Id*.   Straka continued to make his way to the U.S. Capitol. *Id*.   While walking, Straka learned that the U.S. Capitol had been breached. *Id*. Straka estimated that he got off of the Metro sometime between 2:00 p.m. and 2:20 p.m. before making his way to the U.S. Capitol grounds. *See* ECF 28, at ¶ 18.

 Upon arriving at the U.S. Capitol from the east side, Straka observed a crowd of people outside of the U.S. Capitol.   Undeterred, Straka made his way through the crowd, into the restricted area of the U.S. Capitol grounds, and up the East Front steps of the U.S. Capitol.   While in the restricted area, Straka observed the crowd yelling and U.S. Capitol Police trying to prevent people from going into the U.S. Capitol.

Straka recorded himself while in this restricted area.1   As Straka stood outside of the U.S. Capitol, he observed people attempting to make entry into the U.S. Capitol.   Straka can be heard stating, "We're going in.   They're saying we're going in.   People are going in."   As the crowd moves forward, Straka can be heard stating, "go, go, go." *See* ECF 26, at ¶ 9.   Straka was standing a mere 10 to 20 feet away East Rotunda Doors while encouraging the rioters to enter the U.S. Capitol. *See* ECF 1, p. 2 at ¶ 5.

Straka continued to film the mayhem and the chaos outside of the U.S. Capitol.   He denied seeing any vandalism or acts of violence. *See* ECF 28, at ¶ 25.   Nevertheless, the chanting crowd continued to make entry into the U.S. Capitol while making statements such as "This is our house" and "This is our country, and we are taking it back."

Straka continued to film while rioters forcefully removed a police officer's shield from his possession. *See* ECF 28, at ¶ 18. The crowd can be heard chanting "take it, take it." *Id*.   Straka chants along with the crowd as the rioters successfully pulled the shield away from the officer as

he struggled to maintain possession of his shield. *See* ECF 1, pp. 4-7. A large group of people then simultaneously pushed toward the officer as Straka and others chanted, "USA!"  *Id*. The officer was able to get his shield back. *Id*. There is no indication that Straka participated in removing the shield from the officer.   Yet, Straka does nothing to discourage the rioters from removing the shield.   Instead, Straka encouraged the rioters to take the shield away from the officer.

Straka made his way within feet of the threshold of the East Rotunda Doors of the U.S. Capitol.   Numerous rioters entered the U.S. Capitol.   Many more attempted to enter.   While standing near the entrance, Straka was exposed to tear gas that was released inside of the U.S. Capitol by U.S. Capitol Police Officers. *See* ECF 1, p. 5 at ¶ 2.   Despite this, at no point did Straka discourage the rioters from making entry.   Straka continued to film himself, this time turning the camera towards his face and stating: "They are using gas right now.   We are being gassed." *Id*. Straka wore a black colored beanie, sunglasses, a face mask, and a plaid-patterned coat.   Gov. Figure D.



Gov. Figure D

Thereafter, a male exiting the U.S. Capitol could be heard saying, "We did our job…We got our job done." This individual then said, "Let's get out of here." Another individual stated,

"Mission accomplished." *See* Exhibit 1. *See also See* ECF 1, p.6 at ¶ 1. The video ended with Straka standing outside of the U.S. Capitol. *Id*. Straka estimates that he stood outside of the U.S. Capitol for approximately fifteen minutes, and then left without having entered the building.   *See* ECF 28, at ¶ 18.

At 2:33 pm on January 6, 2021, Michael Coudrey, the national coordinator for Stop the Steal, sent a message to a group chat telling those in the chat that the event that Straka was scheduled to speak at would be delayed because "They stormed the capital[sic]."   Joshua Kaplan and Joaquin Sapien, *New Details Suggest Senior Trump Aides Knew Jan. 6 Rally Could Get Chaotic*, ProPublica (June 25, 2021) available at https://www.propublica.org/article/new-details-suggest-senior-trump-aides-knew-jan-6-rally-could-get-chaotic (last visited December 16, 2021). Straka responded, "I just got gassed! Never felt so fucking alive in my life!!!" *Id*.   Later, as law enforcement was still working to clear rioters from Capitol grounds, Straka encouraged them to continue fighting:



Gov. Figure E

Straka posted the video of himself on the grounds of the U.S. Capitol on January 6 on his personal Twitter page.   On January 11th , the FBI learned of this posting after receiving a tip about

the video being posted on Twitter. *See* ECF 1, p. 2 at ¶ 1. When the FBI attempted to view the video on the evening of January 11, the video had been removed. *Id*.



Gov. Figure F

*Social Media Posts*

On January 6, Straka posted comments to his Twitter account while he was at the U.S. Capitol.   Straka promoted the riot and did not speak against the conduct of the rioters or his own conduct.   Straka also posted the video that he recorded while at the U.S. Capitol to Twitter.

The following day, Straka posted a 58-minute video to his Twitter account. In this video,

Straka recounted the events of January 6. Straka used this posting to clarify comments that he made on Twitter on January 6 after he left the U.S. Capitol.   Straka stated, "It was not Antifa, it was patriots desperate to be heard. When I made that comment on Twitter, I had no idea that there was any vandalism or violence or any of that stuff. I literally saw people walking through an open door, and for anyone who doubts my story, I have it all on video. I have the entire thing on video." While Straka had an immense platform to denounce his own conduct and the conduct of the rioters, he elected not to do so and instead doubled down on his inflammatory rhetoric.

<em>Straka's Conduct While on Probation</em>

On February 22, 2023, the U.S. Probation Office filed a U.S. Probation Office Memorandum as a status report regarding Straka's supervision by the probation office. ECF No. 59.   U.S. Probation reported that Straka was compliant with the terms of his probation.

In April 2023, the government received emails from two concerned citizens regarding Straka's conduct. One of the concerned citizens expressed concern over Straka's conduct on social media, much of which appears to be Straka lamenting about not being treated fairly by the criminal justice system and re-litigating the facts of this case and his conduct on January 6, 2021. *See* Gov. Exhibit A.   The email also referenced an incident occurring between Straka and a reporter in which Straka appears to physically confront the reporter.   *Id*.   In a second email, another concerned citizen notified the government regarding Straka's online rhetoric.   *See* Gov. Exhibit B.

The government forwarded these emails to U.S. Probation in April 2023.   U.S. Probation advised that Straka's conduct did not meet the criteria for a violation.   U.S. Probation also confirmed that no reports of harassment or assault had been filed against Straka, as it related to his alleged encounter with the reporter.

9

In June 2023, the government received a third email from a third concerned citizen.   The citizen provided the government with what appears to be a letter that the concerned citizen sent to this Court regarding concerns over Straka's social media posts. *See* Gov. Exhibit C.

## II.    PROCEDURAL BACKGROUND

On January 20, 2021, Straka was charged by complaint with violating 18 U.S.C. § 231(a)(3), impeding a law enforcement officer during civil disorder; 18 U.S.C. §§ 1752(a)(1) and (2), knowingly entering and remaining on restricted grounds without lawful authority and/or engaging in disorderly conduct within proximity to a restricted building to impede official functions; and 40 U.S.C. §§ 5104(e)(2)(D), engaging in disorderly conduct with the intent to disturb a hearing before Congress.

On September 15, 2021, Straka was charged in one-count Information with violating 40 U.S.C. §§ 5104(e)(2)(D).   On October 5, 2021, the government filed a Superseding Information charging Straka with 40 U.S.C. §§ 5104(e)(2)(D). By plea agreement, Straka agreed to pay $500 in restitution to the Department of the Treasury.

On January 24, 2022, Straka was sentenced to 36 months of probation, and three months of home detention. The Court also ordered Straka to complete 60 hours of community service, and to pay all fines and restitution imposed.

On August 9, 2023, Straka filed his Motion for Early Termination of Probation.

## III.    LEGAL AUTHORITIES

Pursuant to 18 U.S.C. § 3564(c), a court has discretion to terminate a term of probation imposed in a misdemeanor case at any time "if it is satisfied that such action is warranted by the conduct of the defendant and the interest of justice." 18 U.S.C. § 3564(c). In making this determination, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), to the extent

they are applicable. *Id.*; *see also United States v. Hartley*, 34 F.4th 919 (10th Cir. 2022) (holding that a district court must make individualized determinations based on the applicable statutory criteria before responding to a request to modify a sentence); *cf. United States v. Ferrell,* 234 F.Supp.3d 61, 63 (D.D.C. 2017) (same holding for considering early termination of probation in felony case).   "The point of a motion to modify a sentence is to review what may have changed in the intervening period." *Hartley*, 34 F.4th 919, 932, n.9 (10th Cir. 2022). This makes sense since the Court must reconsider the same § 3553(a) factors that it considered when imposing the original sentence. *See, e.g., United States v. Martin*, No. 89 CR. 405 (DNE), 1992 WL 178585, at *1 (S.D.N.Y. July 13, 1992) (denying motion for early termination of probation under 18 U.S.C. § 3564(c) where the defendant failed to offer "the existence of new circumstances that merit a modification of the original sentence")*.* Thus, absent a relevant change, there is no basis for the Court to reduce the sentence already imposed.

Courts routinely have held that mere compliance with the conditions of probation without more does not warrant early termination. *See United States v. Salazar*, 693 F. App'x 565, 566 (9th Cir. 2017) (affirming denial of motion to modify conditions of probation where "the magistrate judge applied the correct legal standard when she considered the 18 U.S.C. § 3553(a) factors and determined that Salazar's mere compliance with the conditions of probation, without more, did not warrant early termination"); *United States v. Acosta-Triana*, No. CR 01-0817 (ES), 2017 WL 4786559, at *2 (D.N.J. Oct. 23, 2017) (finding general compliance with probation terms "insufficient to terminate probation"); *United States v. Rusin*, 105 F. Supp. 3d 291, 292 (S.D.N.Y. 2015) (stating that full compliance with probation conditions is what is expected of defendants and "[e]arly termination is not warranted where a defendant did nothing more than that which he was required to do by law."). Although "extraordinary circumstances . . .   are not necessary for such

termination," they "may be sufficient to justify early termination of a term of supervised release." *United States v. Melvin*, 978 F.3d 49, 53 (3d Cir. 2020).

Likewise in the similar analysis for supervised release modification motions, model post-incarceration conduct and unblemished compliance with the terms of supervised release, standing alone, have been found insufficient to warrant early termination of supervised release when the defendant has not "show[n] something 'of an unusual or extraordinary nature' in addition to full compliance." *United States v. Longerbeam*, 199 F.Supp.3d 1, 2–3 (D.D.C. 2016) (holding that "while the Court commends defendant for his law-abiding conduct and personal successes, such activities are expected of a person on supervised release and do not amount to "exceptionally good behavior" or "something of an unusual or extraordinary nature in addition to full compliance."); *see also United States v. Mathis–Gardner*, 110 F.Supp.3d 91, 93–94 (D.D.C. 2015) (noting courts "have found that mere compliance with the conditions of release is not enough to merit early termination of supervised release because model prison conduct and full compliance with the terms of supervised release is what is expected of a person under the magnifying glass of supervised release") (quotations omitted).

## IV.    Analysis

### A.    Straka Has Not Demonstrated New or Unforeseen Circumstances that Warrant Early Termination of Probation.

Straka's motion fails to raise any new or unforeseen circumstances that warrant early termination of his 36-month term of probation. Straka offers that, since his conviction, he has satisfied the conditions that this Court has imposed. Compliance with the terms of probation is not a valid basis upon which to terminate probation early. Compliance is the expectation. Although Straka's stable life post-sentencing may be considered commendable, that stability did not prevent his conduct at the United States Capitol during the Electoral College certification on January 6,

2021. The full term of probation is necessary to ensure that Straka continues to refrain from engaging in criminal activity.

Straka's "hardship" of being supervised by multiple jurisdictions since his move to New York also does not merit early termination. The government is unaware that U.S. Probation is unable to adequately supervise Straka. And should this Court determine that there is a hardship, the remedy could simply be to transfer jurisdiction to another office that would be the sole supervisor of Straka.

**B. Early Termination of Straka's Probation Does Not Serve the Interest of Justice.**

Looking to the sentencing factors under 18 U.S.C. § 3553(a), early termination of probation here would not serve the interest of justice. As to the nature and circumstances of the offense, § 3553(a)(1), Straka participated in the January 6, 2021 assault on the United States Capitol, which delayed the certification of the Electoral College. Straka did so after using his social media to encourage his influencers to "rise up!" prior to January 6, 2021. On January 6, 2021, Straka's conduct escalated, as did his social media conduct when he encouraged rioters to "hold the line" a reference that encourages the rioters to continue to rage against law enforcement and to continue their assault upon the Capitol. Even after January 6, 2021, Straka used his social media to deny the seriousness of what occurred on January 6th. Notably, after issuing an apology at his sentencing, Straka has used his time on probation to re-write what occurred at sentencing. At sentencing, Straka was more than willing to accept responsibility for his conduct on January 6th. Since that day, he has continued to use social media to belittle the severity of his plea and the pleas of other rioters, and he has chosen to use his platform to re-litigate his conduct on that day. Straka simply refuses to take complete responsibility for his conduct on January 6th, which makes his request for early release from probation objectionable. While the government does not seek to

punish Straka for his political speech or views, which he is free to espouse, his lack of acceptance of responsibility is concerning.

As to other sentencing factors—the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); and the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B)—this Court carefully considered these factors in imposing 36 months of probation. Straka's request for a reduction in that period would undercut the Court's balancing of the § 3553(a) factors after hearing from the government, defense counsel, and Straka's at the sentencing hearing.

Further undermining the interest of justice, granting Straka's motion for early termination may result in significant sentencing disparities between him and similarly situated January 6 defendants. 18 U.S.C. § 3553(a)(6); *see also United States v. Yung*, 1998 WL 422795, at *2 (D. Kan. June 12, 1998) (noting that if the court were to terminate the defendant's supervision early, "it would subvert the underlying policy of the Federal Sentencing Reform Act of 1984 to eliminate sentencing disparity among defendants guilty of similar offenses" and that the defendant's role in the conspiracy made him "more culpable than other convicted participants").

Since Straka's sentencing, scores of additional Capitol-breach defendants have been sentenced. To aid sentencing courts, the government has developed a table providing additional information about sentences imposed on other defendants that is available at www.justice.gov/file/1567746/download. As demonstrated by this table, terminating Straka's probationary sentence at approximately 19 months would result in significant sentencing disparities with similarly situated defendants.

In sum, Straka presents no new information warranting early termination of probation.

14

The Court carefully crafted a sentence of a significant period of probation—36 months—that included conditions to address each of the § 3553(a) factors. A reduction in probation period would contravene the interest of justice, especially considering the nature and circumstances of Straka's offense and the sentencing disparity that reduction would create relative to other January 6 defendants.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:      /s/ Brittany L. Reed
         BRITTANY L. REED
         Assistant United States Attorney
         Detailee- La. Bar Roll No. 31299
         U.S. Attorney's Office
         650 Poydras Street, Suite 1600
         New Orleans, Louisiana 70130
         Office: 504-680-3031
         Brittany.Reed2@usdoj.gov